Christopher J. Keller
(admitted *pro hac vice*)
Christopher J. McDonald
(admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cmcdonald@labaton.com

*Co-Lead Counsel for Lead Plaintiff and
the Class*

Mark Labaton (Bar No. 159555)
MOTLEY RICE LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024
Telephone: (310) 500-3488
Facsimile: (310) 824-2870
Email: mlabaton@motleyrice.com

*Liaison Counsel for the Class*

Sherrie R. Savett (admitted *pro hac vice*)
Barbara A. Podell
(admitted *pro hac vice*)
Douglas M. Risen
(admitted *pro hac vice*)
Eric Lechtzin (Bar No. 248958)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3071
Facsimile: (215) 875-5715
Email: ssavett@bm.net

*Co-Lead Counsel for Lead Plaintiff and
the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BECKMAN COULTER, INC. SECURITIES LITIGATION | **Case No.: 8:10-cv-1327-JST (RNBx)** |
| | **Honorable Josephine Staton Tucker** |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ........................................................ 1

PARTIES........................................................................................ 6

    Lead Plaintiff ......................................................................... 6

    Named Plaintiff..................................................................... 7

    Defendants ............................................................................. 7

CONTROL PERSON ALLEGATIONS................................. 8

JURISDICTION AND VENUE ............................................... 10

FACTUAL ALLEGATIONS ..................................................... 11

    A.    Background......................................................... 11

        1.    Company Overview ............................... 11

        2.    Beckman's Immunoassay Business: The Critical Importance Of Its Troponin Test Kit ....................... 12

        3.    Beckman's Business Model: The Critical Importance of Recurring Revenue....................... 14

        4.    The Olympus Acquisition ......................... 15

    B.    Beckman Misled The Investing Public Concerning Its Operations, Products, And Prospects................................... 16

        1.    Beckman Concealed Its Long-Standing Quality, Safety, and Compliance Problems ................... 16

        2.    Beckman Continued To Conceal Its Quality, Safety, And Compliance Problems While Misleading The Investing Public Concerning The Problems With Its Troponin Test Kit.................... 23

    C.    The July 22, 2010 Corrective Disclosures: The Truth Finally Emerges ......................... 38

    D.    Defendants' Statements During And After The July 22, 2010 Conference Call Raise A Strong Inference Of Scienter That Defendants Knew Or Were Deliberately Reckless In Not Knowing That Their Class Period Statements And Omissions Were Materially False And Misleading ......................... 43

    E.    Defendants' False and Misleading Statements............. 47

        1.    The July 30, 2009 Form 8-K, Press Release and Earnings Call:................ 48

2.   The August 3, 2009 Form 8-K and Press Release ................. 51

3.   The August 5, 2009 Form 10-Q ........................................... 52

4.   The October 29, 2009 Form 8-K, Press Release and Earnings Call ................................................................. 53

5.   The November 4, 2009 Oppenheimer & Co. Healthcare Conference .................................................................. 56

6.   The November 5, 2009 Form 10-Q ..................................... 58

7.   The December 17, 2009 Form 8-K, Press Release and Annual Business Review ................................................. 60

8.   The February 8, 2010 Form 8-K ......................................... 62

9.   The February 11 Form 8-K, Press Release and Earnings Call ................................................................................ 63

10.  The February 22, 2010 Form 10-K ..................................... 67

11.  The March 9, 2010 Cowen Healthcare Conference ............... 69

12.  The March 22, 2010 Form 8-K and March 23, 2010 Barclays Capital Global Healthcare Conference ................... 71

13.  The April 12, 2010 Form 8-K ............................................. 76

14.  The April 28, 2010 Form 8-K, Press Release and Earnings Call ................................................................. 78

15.  The May 5, 2010 Form 10-Q .............................................. 85

16.  The May 19, 2010 Robert W Baird Stock Conference ........... 88

POST-CLASS PERIOD EVENTS ............................................. 92

CLASS ACTION ALLEGATIONS ............................................ 95

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ................................... 96

LOSS CAUSATION/ECONOMIC LOSS ................................... 97

1.   Disclosure Of Beckman's Unauthorized Changes To The AccuTnI Troponin Test Kit Without FDA Approval ............. 98

2.   Disclosure Of Beckman's Recall Of The AccuTnI Test Kits On The DxI Systems ................................................. 98

3.   Disclosure Of Troponin Problems Stretching Into 2011 ........ 98

4.   Full Disclosure of Beckman's Troponin And Other Quality, Safety, And Compliance Problems, The

Resources Needed To Fix Them, And Downward
Revision Of Earnings Guidance For Fiscal 2010 ................... 99

NO SAFE HARBOR.................................................................. 99

FIRST CAUSE OF ACTION
(For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Defendants)....................................................... 100

SECOND CAUSE OF ACTION
(For Violation of §20(a) of the 1934 Act
Against All Defendants)....................................................... 103

PRAYER FOR RELIEF............................................................ 104

JURY DEMAND ..................................................................... 104

1    Arkansas Teacher Retirement System and Iron Workers District Counsel of
2    New England Pension Fund, together the court-appointed lead plaintiff
3    ("Plaintiff") in this consolidated action, by their undersigned attorneys, hereby
4    bring this consolidated amended complaint for violation of federal securities laws
5    against Beckman Coulter, Inc. ("Beckman" or the "Company"), Scott T. Garrett
6    ("Garrett"), and Charles P. Slacik ("Slacik," together with Garrett, the "Individual
7    Defendants," and collectively with Beckman, "Defendants"). The allegations
8    herein are based on personal knowledge with respect to Plaintiff's acts and on
9    information and belief as to all other matters, such information and belief having
10   been informed by the investigation by and under the supervision of Plaintiff's
11   counsel, which included review and analysis of publicly available information,
12   consultations with experts, and interviews of former employees of Beckman and
13   other persons with knowledge of the matters alleged herein. Plaintiff believes that
14   substantial additional evidentiary support will exist for the allegations set forth
15   herein after a reasonable opportunity for discovery.  On behalf of all members of
16   the class it seeks to represent, Plaintiff alleges as follows:

17                            **NATURE OF THE ACTION**

18        1.    This is a securities fraud class action on behalf of all persons who
19   purchased or otherwise acquired Beckman securities between July 31, 2009 and
20   July 22, 2010, inclusive (the acquirers being the "Class" and the timeframe being
21   the "Class Period").  Plaintiff alleges that Beckman and the Individual Defendants
22   violated the Securities Exchange Act of 1934 (the "1934 Act").  Defendants, with
23   the requisite mental state per the 1934 Act, made a series of materially false and
24   misleading statements and omissions during the Class Period which artificially
25   inflated the value of Beckman's securities; later corrective disclosures caused the
26   stock price to decline, causing Plaintiff and the Class injury.

27        2.    Beckman manufactures and markets biomedical testing instrument
28   systems, tests and supplies using a recurring revenue "razors-and-blades" business

1   model.   The systems – machines the Company sells or leases that automate
2   biomedical testing processes – are the razors.   The tests – kits that Beckman's
3   customers (*i.e.*, the operators of the systems) need to perform the desired
4   biomedical analyses – are the blades.   The kits contain reagents that react with
5   patient samples (*e.g.*, blood, urine or other bodily fluids) to determine the presence
6   or concentration of substances within the samples.

7       3.   On July 30, 2009, Beckman reported "excellent" financial results
8   while touting "the resilience of [its] recurring revenue business model," and its
9   ability to "bring[] higher levels of productivity, quality, and safety to the
10  laboratory."   Less than a year later, however, the Company was reeling from
11  "quality challenges in the U.S. market," reporting its second earnings miss in as
12  many quarters, and reducing its guidance for the remainder of the year.   Beckman's
13  so-called "recent" compliance and quality challenges prompted defendant Garrett
14  to announce on July 22, 2010 that extensive "remediation plans" were required.
15  The "significant additional focus and investment" needed to fix the Company's
16  problems – including "some projects continuing through 2011" – also caused it to
17  "defer[] some other initiatives pending resolution of the aforementioned issues."

18      4.   The following day, Beckman's stock plummeted by more than $12
19  per share (a decline of 21%) on high volume.   The Company lost over $875 million
20  in market capitalization in a single day.

21      5.   How – and when – the "quality" of Beckman's products and services
22  started to become an anchor that would drag down the Company's earnings is at
23  the heart of this action.   The scope and scale of the Company's corrective
24  disclosures on July 22, 2010 make clear that its underlying problems were long-
25  standing and systemic.   This is borne out by information provided to Plaintiff's
26  counsel by a former Beckman senior engineer whose job included "product
27  compliance engineering" responsibilities.   He confirmed that Beckman's quality,
28  safety, and compliance functions were in a steady state of decline after annual

1   rounds of layoffs in the years leading to the start of the Class Period in July 2009.
2   Moreover, he provided multiple examples of quality, safety, and compliance
3   problems that were known to Beckman management, in some cases for years, but
4   which went unresolved.

5        6.    Beckman's long-standing quality, safety, and compliance problems
6   stood in stark contrast to its stated commitment to "growth, quality and operating
7   excellence."   Indeed, despite that oft-repeated commitment, it took the Company
8   until March 22, 2010 – fully two-thirds of the way through the Class Period – to
9   announce that *any* internal examination of its processes or procedures was under
10   way.   And even then the Company positioned its evaluation not as a corrective
11   disclosure of efforts to fix systemic problems, but rather as a proactive response to
12   two isolated incidents: (1) a January 2010 recall concerning sodium testing on its
13   clinical chemistry analyzers, and; (2) a February 2010 "product corrective action"
14   Beckman issued concerning discrepancies relating to its reagent test kit for
15   troponin, a cardiac enzyme released into the blood stream when a patient suffers a
16   heart attack.

17        7.    Beckman's February 2010 "product corrective action" concerning its
18   troponin test was the first in a series of disclosures during the Class Period that
19   both informed the investing public of bad news and misled the investing public
20   because the truth was always worse than what Beckman was disclosing at the time.
21   With its February 2010 "product corrective action" announcement, Beckman
22   informed investors that it had instructed customers with the "DxI" family of
23   immunoassay analyzers to "immediately discontinue" running the troponin test kit
24   if an alternative was available. Results of troponin tests on DxI systems had shown
25   a "positive bias of up to 48%"; while a patient sample analyzed on a different type
26   of Beckman immunoassay analyzer would provide results within an acceptably
27   accurate range, there was a significant chance that testing a sample from the *same*
28   patient on a DxI system would return erroneous results of elevated troponin levels.

8.    Over the next several months, investors received more bad news. In the March 22, 2010 announcement discussed above, the Company disclosed that the Food and Drug Administration ("FDA") had determined that the Company made modifications to its troponin test kits without obtaining the appropriate product clearance from the FDA, that additional restrictions would be placed on the use of the kits, and that the Company needed to reapply for regulatory approval to market the kits.  On this news, Beckman's stock dropped $4.88 per share, or over 7%, on high volume.

9.    In early April 2010 the Company announced that it would be recalling its troponin assay test kit from use on the DxI system.  In response, Beckman's stock dropped $0.91 per share, or 1.5%, on high volume.

10.    Later that month, because of costs associated with addressing a discrete list of issues, including its troponin test, its sodium and glucose tests, and the Company's internal evaluation (collectively described by the Company as its "pending product compliance and quality matters"), the Company announced that it was revising full year 2010 guidance downward.  While a downward reduction in guidance is clearly not good news, following the announcement Beckman's stock price actually increased because the market had expected a steeper reduction in guidance.

11.    In May 2010, the Company announced that it would take until the first half of 2011 to conduct the clinical trials necessary to permit it to reapply for regulatory clearance from the FDA for its troponin test kits.  On this news, Beckman's stock dropped $2.24, or 3.7% , on high volume.

12.    The Company's incrementally negative announcements concerning troponin test kits were accompanied by a months-long effort to gradually manage the market's expectations downward.   In the Company's February 2010 announcement concerning its recommendation that DxI system customers "immediately discontinue" the use of troponin test kits, the Company stated that

while it "currently believe[d]" its action "will not have a material adverse affect on our results of operations," it added that it could "not provide any assurances" to that effect.  With the Company's March 2010 announcement that the FDA had determined that Beckman made unapproved modifications to its troponin test kits, the message changed: "these matters *may* have a material adverse impact on our previously issued outlook for the full year 2010." (Emphasis added.)  Moreover, the Company rolled out the possibility of more bad news: "It is *possible* that more of our products *could* be affected and the actions with respect to those products *could* adversely affect our operating results." (Emphasis added.)

13.   By April 2010, the possibility of a "material adverse impact" became a reality – the Company revised its guidance downward – and the Company again announced the possibility that other "corrective actions . . . *might* adversely affect our operating results." (Emphasis added.)   That too became a reality with the Company's July 22, 2010 corrective disclosures and further reduced guidance.

14.   The fatal flaw with the unfolding nature of Beckman's narrative is that Defendants knew or were deliberately reckless in not knowing *all along* about the Company's systemic, and self-inflicted, problems, and fraudulently misled investors with their omissions and misrepresentations about them.  The Company itself made the modifications to its troponin test kits without obtaining the appropriate product clearance from the FDA; recalls, regulatory action, and reduced earnings were thus entirely foreseeable *when the changes were being made*.

15.   Likewise, the Company's underlying – and undisclosed – quality, safety and compliance issues (which were also of its own making) predated its claimed ability to deliver "higher levels of productivity, quality, and safety" in July 2009.   The question, therefore, was not *whether* Beckman's operating results would be adversely impacted by quality and compliance problems (as the Company's statements in March and April 2010 about what "could" or "might"

1   occur suggest), but *when*.  When defendant Garrett first provided insight into the
2   depth and breadth of adverse information about Beckman's product compliance
3   and quality systems on July 22, 2010, it became clear to the investing public that
4   the Company's problems were long-standing and deeply rooted.  And as confirmed
5   by the information gleaned from Beckman's former senior engineer, the
6   Company's large-scale mobilization and repurposing of resources to fix those
7   problems was long overdue.

8       16.   Defendants' misrepresentations and/or omissions, specifically with
9   respect to its troponin test kits and more generally with respect to quality and
10   compliance issues, had the purpose and effect of (i) concealing from the investing
11   public material information concerning Beckman's operations, products, and
12   prospects, and (ii) supporting the artificially inflated price of its securities.
13   Defendants had actual knowledge of their misrepresentations and omissions of
14   material facts, or acted with deliberately reckless disregard for the truth in that they
15   failed to ascertain and to disclose such facts, even though such facts were available
16   to them.

17   **PARTIES**

18   **<u>Lead Plaintiff</u>**

19       17.   Arkansas Teacher Retirement System ("ATRS") is a government-
20   sponsored, defined benefit retirement plan for the current and former employees of
21   the Arkansas public schools and educationally related agencies. ATRS manages
22   approximately $10 billion in assets.  Its principal office and place of business is
23   located at 1400 West Third Street, Little Rock, Arkansas.   ATRS purchased
24   Beckman common stock at artificially inflated prices during the Class Period and
25   has, accordingly, been damaged by Defendants' wrongful conduct. Attached hereto
26   is a certification reflecting ATRS's transactions in Beckman common stock during
27   the Class Period.

28

1    18.    Iron Workers District Counsel of New England Pension Fund ("Iron
2    Workers") is a pension fund that has approximately 2000 participants and $291
3    million in assets.  Iron Workers was created in 1957 by the New England District
4    of Ironworkers.  Its principal place of business is 161 Granite Avenue, Dorchester,
5    Massachusetts.   Iron Workers purchased Beckman common stock at artificially
6    inflated prices during the Class Period and has, accordingly, been damaged by
7    Defendants' wrongful conduct.  Attached hereto is a certification reflecting Iron
8    Workers' transactions in Beckman common stock during the Class Period.
9    **Named Plaintiff**

10    19.    Named plaintiff Steelworkers Pension Trust ("Steelworkers"), an
11    institutional investor, is a multi-employer pension plan.  Steelworkers was created
12    in 1953 by the Upholsterers' International Union ("UIU"), and was national in
13    scope and covered employees of many employers in many trades and industries.
14    In 1985, when the UIU merged with the United Steelworkers ("USW"), the USW
15    became the sponsoring union, and the name of the trust was officially changed to
16    "Steelworkers Pension Trust."    As of January 31, 2011, Steelworkers has
17    approximately 54,870 active participants, 552 participating employers and
18    approximately $2.2 billion in assets.  Steelworkers purchased Beckman common
19    stock at artificially inflated prices during the Class Period and has, accordingly,
20    been damaged by Defendants' wrongful conduct. Attached hereto is a certification
21    reflecting Steelworkers' transactions in Beckman common stock during the Class
22    Period.
23    **Defendants**

24    20.    Defendant Beckman is a manufacturer and marketer of biomedical
25    testing instrument systems, tests and supplies.    According to its website
26    (www.beckmancoulter.com), Beckman "develops, manufactures and markets
27    products that simplify, automate and innovate complex biomedical testing."
28    Beckman has its principal place of business at 250 S. Kraemer Boulevard, Brea,

1    California.  Beckman trades on the New York Stock Exchange ("NYSE") under

2    the ticker symbol "BEC".

3    　　　21.    Defendant Garrett was, at all relevant times, Chairman of the Board,

4    President and Chief Executive Officer ("CEO") of Beckman. Garrett became

5    President and Chief Operating Officer in December 2003, Chief Executive Officer

6    in February 2005, and Chairman of the Board in April 2008.  Effective September

7    6, 2010, Garrett resigned his position as Chairman of the Board, President and

8    CEO but remained employed with Beckman as a full-time, non-executive advisor

9    to the Chairman of the Board until January 15, 2011. During the Class Period,

10   Garrett made numerous materially false and misleading statements and omissions

11   that caused the price of Beckman's stock to remain at artificially inflated levels.

12   　　　22.    Defendant Slacik is, and at all relevant times was, Chief Financial

13   Officer ("CFO") and Senior Vice President of Finance of Beckman. He joined

14   Beckman as CFO and Senior Vice President in October 2006. In January 2007, he

15   took over leadership of Information Technology and is responsible for all aspects

16   of financial management and information technology.  During the Class Period,

17   Slacik made numerous materially false and misleading statements and omissions

18   that caused the price of Beckman's stock to remain at artificially inflated levels.

19   　　　　　　　　　　**CONTROL PERSON ALLEGATIONS**

20   　　　23.    The Individual Defendants, because of their positions of control and

21   authority as senior executive officers and, with respect to Garrett, as the

22   Company's Chairman, had access to the adverse undisclosed information about its

23   operations, products, and prospects through their access to internal corporate

24   documents and information, conversations and associations with other corporate

25   officers and employees, attendance at management and/or Board of Directors

26   meetings and committees thereof, and reports and other information provided to

27   them in connection therewith.

28

24.     The Individual Defendants participated in drafting, preparing, and/or approving the public reports and other statements and communications complained of herein and were aware of, or were deliberately reckless in disregarding, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

25.     The Individual Defendants, as senior executive officers and a Director of the Company, were able to and did control the content of the various filings with the Securities and Exchange Commission ("SEC"), press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.   The Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

26.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the 1934 Act, traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, products, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.   The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.  Under rules and regulations promulgated by the SEC under the Exchange Act, including Item 303 of Regulation S-K, Defendants also had a duty to report, among other things, all trends and uncertainties that were reasonably likely to affect Beckman's net sales,

1    revenues, or income.  Defendants' wrongdoing during the Class Period, as alleged
2    herein, also violated this specific requirement and obligation.

3        27.    Each of the Individual Defendants is liable as a primary participant in
4    a wrongful scheme and course of business that operated as a fraud and deceit on
5    purchasers of Beckman securities during the Class Period, which included the
6    dissemination of materially false and misleading statements and concealment of
7    material adverse facts.

8        28.    In making the statements complained of herein, the Individual
9    Defendants, who were senior executive officers and controlling persons of
10   Beckman, were acting on behalf of the Company in the regular course of business.
11   Therefore, each of the statements made by the Individual Defendants is attributable
12   to the Company.

13                          **JURISDICTION AND VENUE**

14       29.    The claims asserted herein arise under and pursuant to Sections10(b)
15   and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") [15 U.S.C.
16   §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17
17   C.F.R. §240.10b-5].

18       30.    This Court has jurisdiction over the subject matter of this action
19   pursuant to 28 U.S.C. §1331 and §1337 and Section 27 of the 1934 Act.

20       31.    Venue is proper in this District pursuant to Section 27 of the 1934 Act
21   and 28 U.S.C. §1391(b). Beckman maintains offices in this District and many of
22   the acts charged herein, including the preparation and dissemination of materially
23   false and misleading information, occurred in substantial part in this District.

24       32.    In connection with the acts alleged in this Complaint, Defendants,
25   directly or indirectly, used the means and instrumentalities of interstate commerce,
26   including, but not limited to, the mails, interstate telephone communications and
27   the facilities of the national securities markets.

28

# FACTUAL ALLEGATIONS

## A.    Background

### 1.    Company Overview

33.    Beckman is the world's largest company devoted solely to biomedical testing.  According to its Form 10-K for 2009, Beckman is a leading manufacturer and marketer of biomedical testing instrument systems, tests and supplies that simplify, automate and innovate complex laboratory processes.

34.    Beckman's business is divided into two segments: Clinical Diagnostics and Life Science.  The Life Science segment serves companies in the pharmaceutical and biotechnology industries, universities, medical schools, and research institutions.  Broadly, Life Science research instruments and tools are used to study biological problems such as the causes of disease, identify new therapies, and test new drugs.

35.    Clinical Diagnostics is, by far, the larger of Beckman's two business segments.  In 2009, over 85% of the Company's revenue was generated by Clinical Diagnostics.  Clinical Diagnostics products produce information physicians use to diagnose disease, make treatment decisions, and monitor patients in hospitals and other critical care settings.  Beckman's Clinical Diagnostics customers include hospitals, physician's offices and reference laboratories.

36.    The Clinical Diagnostics segment is divided into three major categories: Chemistry and Clinical Automation; Cellular, and; Immunoassay and Molecular Diagnostics.  The chart below, reproduced from Beckman's 2009 Form 10-K, gives a breakdown of the Company's sales, products, market share, and major competitors.

Comprehensive Product Portfolio:   **2009 Sales $3.26 Billion**

## 2. Beckman's Immunoassay Business: The Critical Importance Of Its Troponin Test Kit

37.   Troponin is a cardiac enzyme – a biochemical catalyst found in the tissues of the heart.   It plays a critical role in regulating how heart muscles contract.   When the heart is damaged, such as during a heart attack, high concentrations of troponin and other cardiac enzymes are released into the bloodstream.   Within four hours after cardiac injury, troponin levels in the blood will rise, and can remain elevated as long as 10-14 days.

38.   Troponin tests are used by hospitals in connection with cardiac risk assessment (*i.e.*, as a diagnostic tool to aid in determining whether a patient has suffered a heart attack).   An emergency room will typically order a troponin test when a patient comes into the hospital with chest pains.

39.     Beckman's reagent test kit for troponin is called AccuTnI® Troponin I ("AccuTnI"). AccuTnI is described by Beckman as having been designed for rapid turnaround and improved sensitivity and specificity, helping laboratories meet a new standard of care in the management of patients with cardiac disease.

40.     Although it is but one of over 60 different types of immunoassay reagent test kits sold by Beckman in areas such as cardiovascular, cancer, fertility, thyroid dysfunction, anemia and infectious diseases, the importance of the AccuTnI to Beckman's immunoassay business cannot be overstated.   On a conference for analysts and investors in May 2010, Paul Glyer, a Beckman Senior Vice President, characterized the AccuTnI as "a very, very important test."  Shortly after the close of the Class Period, on July 27, 2010, defendant Garrett gave additional context for the uniquely important place occupied by the AccuTnI.  In particular, Garrett focused on the unprecedented degree of disruption Beckman's customers would (and, in fact, did) experience as a result of Beckman's inability to market the AccuTnI to certain of its customers:

> Troponin is a very special test, one that we've used to differentiate our immuno assay system for quite a while.   We have a 40% market share in the US and therefore, it's -- it's the -- it's -- *it's more disruptive than any other test would be in terms of its size, its importance to us, its importance to customers.*
>
> In addition, when you think about Beckman Coulter's position in immuno assay, you have to remember that we're the leaders in automation, so a test that moves off of automation that's used as -- *with the importance and the frequency of Troponin disrupts the work flow greater than others would*.   (Emphasis added.)

41.   The AccuTnI was intended to be run on the Access® Immunoassay System and the Access® 2 Immunoassay System (together, the "Access Systems"), and the UniCel® DxI 600 Access Immunoassay System (the "DxI 600"), and the UniCel® DxI 800 Access Immunoassay System (the "DxI 800," and together with the DxI 600, the "DxI Systems").

42.   The Access Systems are targeted to lower volume testing environments.  The DxI 600 is used primarily by mid-volume laboratories and the DxI 800 is used primarily in large hospitals and reference laboratories, which according to the Company, account for approximately 40% of the immunodiagnostic testing market worldwide. The DxI 800 is touted by Beckman as being the highest throughput immunoassay system available in the industry and can run 400 tests per hour.

### 3.   Beckman's Business Model: The Critical Importance of Recurring Revenue

43.   Beckman has described itself as having a "a razor/razor blade" or "recurring revenue" business model.   "Recurring Revenue" is the revenue generated from consumable supplies, including reagent test kits, service, and operating-type lease payments for its leased instruments.  In 2009, approximately 81% of Beckman's total revenue was generated from recurring revenue.

44.   Beckman's operating-type leases are provided under bundled lease arrangements, in which the customers pay a monthly amount for the equipment, consumable supplies (including reagent test kits), and service.  The lease arrangements primarily take the form of what are known as "reagent rentals" where an instrument is placed at a customer location and the customer commits to purchase a certain minimum volume of reagents annually. Beckman also enters into "metered" contracts with customers where the instrument is placed at a customer location with a stock of reagents and the customer is billed monthly based on actual reagent usage.  Beckman's customer contracts typically run five to

1  seven years. Beckman had begun a concerted effort to transition its customer base
2  to OTLs in 2005.

3       45.    Central laboratories of mid- to large-size hospitals represent
4  Beckman's most significant customer group.   Generally, retention rates for
5  customers under operating-type lease arrangements are high. When a customer
6  comes off of a lease, there is generally an advantage to the incumbent company.
7  Switching instrument systems creates significant costs for laboratories - changing
8  suppliers means re-training staff on new systems and performing validation studies
9  to assure consistency of reported results.

10      46.    The Company has stated its belief that recurring revenue is the best
11 indicator of the business's overall strength, and that it allows Beckman to generate
12 substantial operating cash flows, which it uses to facilitate growth of its business
13 by developing, marketing and launching new products through internal
14 development and business and technology acquisitions.

15      47.    While the razors-and-blades analogy is apt, the products Beckman
16 sells are considerably more sophisticated, and the Company and its products are
17 highly regulated.  As reported in the Company's Form 10-K for the fiscal year
18 ending December 31, 2009:

19           We are required to establish a quality system that
20           includes procedures for ensuring regulated products are
21           developed, manufactured and distributed in accordance
22           with specified standards.   We also must establish
23           procedures for investigating and responding to customer
24           complaints regarding the performance of regulated
25           products.

26      **4.    The Olympus Acquisition**

27      48.    On August 3, 2009, Beckman completed its acquisition of the
28 diagnostic systems portion of Olympus Corporation's life science business –

1   Olympus Diagnostic Systems Business ("Olympus") for approximately $780

2   million. Olympus "encompasses the development, manufacturing, marketing, sale,

3   distribution and use of clinical chemistry and immunoassay analyzers, blood

4   transfusion testing systems, and the chemical reagents and other consumables used

5   with them, and related laboratory automation equipment, for in vitro diagnostic

6   testing of samples from humans and animals."

7        49.    In the press release issued and attached to a Form 8-K filed with the

8   SEC announcing the completion of the acquisition, Garrett touted Beckman's

9   "many cross-selling opportunities – the most compelling being promotion of

10  Beckman Coulter's leading Immunoassay products to the loyal base of Olympus'

11  chemistry customers. We remain focused on creating shareholder value through

12  growth, quality and operating excellence. This acquisition demonstrates Beckman

13  Coulter's commitment to further extend our leadership position in chemistry and

14  sustain our above-market growth in immunoassay." (Emphasis added.)

15  **B.    <u>Beckman Misled The Investing Public Concerning Its Operations,</u>

16        <u>Products, And Prospects</u>**

17        **1.    Beckman Concealed Its Long-Standing Quality, Safety, and**

18              **Compliance Problems**

19        50.    The quote in the paragraph above concerning the Olympus transaction

20  includes defendant Garrett stating: "We remain focused on creating shareholder

21  value through growth, quality and operating excellence." Defendants repeatedly

22  stressed these themes during the Class Period. Indeed, Defendants employed the

23  precise phrase "growth, quality and operating excellence" or slight variations on

24  multiple occasions. *See* ¶115 (July 30, 2009 earnings release); ¶118 (August 3,

25  2009 press release); ¶120 (August 5, 2009 Form 10-Q); ¶123 (October 29, 2009

26  analyst call); ¶127 (November 4, 2009 conference); ¶129 (November 5, 2009 Form

27  10-Q); ¶131 (December 17, 2009 press release); ¶136 (February 11, 2010 earnings

28

1 | release); ¶137 (February 11, 2010 earnings call); ¶139 (February 22, 2010 Form
2 | 10-K); ¶152 (May 5, 2010 Form 10-Q).

3 |     51.    Another theme defendant Garrett stressed from the very start of the
4 | Class Period was Beckman's commitment to "aggressively managing expenses and
5 | delivering on our earnings goals." *See* ¶115 (July 30, 2009 earnings release).
6 | While the goal of "aggressively managing expenses" is not, in and of itself,
7 | inconsistent with having a focus on "growth, quality and operating excellence," in
8 | Beckman's case the former took precedence over the latter, to the detriment of
9 | Beckman's customers and, eventually, the purchasers of its securities.

10 |     52.    By repeatedly championing Beckman's "growth, quality and
11 | operating excellence," Defendants affirmatively created an impression that
12 | Beckman was conforming to legitimate and sustainable business activities, a state
13 | of affairs that differed in a material way from that which actually existed. The
14 | undisclosed truth was that Beckman had experienced a significant deterioration in
15 | its quality and operations that severely undermined its capacity for growth.

16 |     53.    As discussed further below, Beckman first disclosed the existence of
17 | what it termed "recent compliance and quality challenges" and the extensive
18 | efforts being undertaken to rectify them on July 22, 2010. *See* ¶103 (July 22, 1010
19 | earnings release). In fact, Beckman's compliance, quality, and safety challenges,
20 | while unknown to the investing public, were well known within the Company, well
21 | documented, and long-standing.

22 |     54.    Among the former Beckman employees interviewed by Plaintiff's
23 | counsel was a former Senior Staff Electronics Engineer (the "Senior Engineer")
24 | who had worked for Beckman for over 30 years. The Senior Engineer, who
25 | worked in the Company's Brea, California facility, confirmed that annual rounds
26 | of layoffs in the years leading to the start of the Class Period left Beckman's
27 | Product Compliance Engineering ("PCE") and Product Development groups
28 | overworked and understaffed. The Senior Engineer explained that the first-line

1    managers to whom he reported on a dotted-line basis, Jeff Gonzalez, Group

2    Manager, Product Compliance Engineering & Calibration Services, and Jay

3    Kessler, Director, Diagnostic Automation Support Services, understood the gravity

4    of allowing quality, safety, and compliance issues to accumulate, and sought

5    unsuccessfully and repeatedly to have Beckman's upper management authorize

6    budgeting for the personnel to address outstanding PCE issues.

7        55.    The Senior Engineer was a member of the Product Development

8    group, but 30% of his time was to be dedicated to PCE functions. In the Spring of

9    2009, he alerted Beckman management that he was spending far more than 30% of

10   his time on PCE matters and was unable to keep up with them. He also warned

11   Beckman management that if the Company were subjected to an audit, the auditors

12   would likely find numerous product safety deficiencies, including many that he

13   had documented in emails and reports sent to Beckman management but which had

14   not been acted on.

15       56.    The Senior Engineer was laid off as part of Beckman's November

16   2009 downsizing. However, in September 2010, *i.e.*, after Beckman disclosed its

17   quality and compliance "challenges" and its massive effort to fix them, the

18   Company requested that he return as a consultant to address one of the many open

19   issues he had identified for Company management while he was still employed by

20   Beckman. In connection with Beckman's request that he return as a consultant, the

21   now-former Senior Engineer again identified for Beckman's management

22   numerous additional examples of quality, safety, and compliance issues, most

23   dating back to 2008, that were previously reported, were still unresolved when he

24   left the Company on November 31, 2009, and that he believed had not been

25   resolved in the interim. That belief was bolstered by the fact that in March 2010,

26   only four months after he was let go, additional layoffs further reduced headcount

27   in the already overworked PCE group.

28

57. Open issues that were still unresolved when the Senior Engineer was laid off ranged from the failure of Beckman systems to pass routine safety inspections, to product design flaws that could threaten the safety of system operators or the integrity of reagent test results. Below are a few examples of these long-standing and undisclosed quality, safety, and compliance problems:

(i) **Example # 1: The "Type 1" Customer Complaint With Respect To Beckman's Power Processor**

58. One of the most serious unresolved compliance issues concerned Beckman's Power Processor Automated Sample Processing System (the "Power Processor"). It involved a "Type 1" customer complaint relating to the Power Processor syringe "drip tray." "Type 1" complaints are the most serious, involving either: (i) the potential for operator injury, or; (ii) a "wrong answer scenario," meaning that the issue has the capacity to generate inaccurate reagent test results. The Power Processor "drip tray" issue involved a wrong answer scenario.

59. According to Beckman's website, the Power Processor "can revolutionize your lab's entire operation, enhancing productivity, operator safety and accuracy, as well as significantly reducing labor costs and eliminating opportunities for errors for improved patient safety." It allows samples to be transported to multiple Beckman analyzers (*e.g.*, immunoassay systems such as the Access and DxI, clinical chemistry instruments such as the DxC family of systems, and hematology instruments such as the LH family of systems) without an operator once samples are initially loaded; samples are transported and handled robotically so that different types of reagent tests can be run concurrently. Although marketed under the Beckman name, the Power Processor was developed and is manufactured by a Japanese company, IDS Ltd. ("IDS").

60. After a rack of test tubes containing samples of different patients' blood, urine or other bodily fluid is loaded into a Power Processor, the tubes are robotically removed from the rack and transported to different modules for further

processing, *e.g.*, centrifugation, decapping (removing caps from the tops of test tubes), and aliquotting (extracting samples of liquid via syringe for reagent testing). Through the Power Processor's automated transport function, test tubes destined for the aliquotting module travel on tracks, while syringes with extracted samples from test tubes that have already been to the aliquotting module travel above the test tubes. Directly beneath each syringe is a "drip tray," the purpose of which is to act as a physical barrier to prevent liquid dripping off the tip of the syringe from falling into test tubes below.

61.   While each syringe is used only once and discarded, the drip trays are used continuously. As explained by the Senior Engineer, the IDS-developed drip tray would fill up with fluids over time. While the drip tray would still prevent dripping fluids from falling *directly* into a test tube from a syringe, when the volume of collected fluid in the drip tray itself became too great, the drip tray would overflow into samples in test tubes below, contaminating them and raising creating a "wrong answer scenario" in the process.

62.   The Senior Engineer was working to address the issue with IDS as far back as the Spring of 2008. However, IDS rejected the drip tray design proposed by Beckman and the problem was never corrected.

### (ii)   Example # 2: The Unresolved "Severe Risk" Rating With Beckman's Auto*Mate*

63.   Another line of IDS-manufactured Beckman products – the Auto*Mate* Sample Processing Systems (the "Auto*Mate*") – had a long-standing safety issue. According to Beckman's website, the Auto*Mate* "has everything you need to streamline pre- and post-analytical processes and position your lab for optimal performance and labor usage. Plus, with the Auto*Mate*, your lab can accommodate greater workflow while posting dramatic gains in test result delivery." The Auto*Mate* "system," like the Power Processor, also performs multiple functions

1  such as centrifugation, decapping, and aliquotting; it does not, however, route
2  samples to analyzers for reagent testing.

3      64.  When the Senior Engineer and other PCE personnel tested the
4  AutoMate, they determined that the force with which the decapper removed caps
5  from test tubes could result in injury to an AutoMate operator in the event the
6  operator opened the door to the decapper and reached inside, for instance, to
7  retrieve a test tube before further processing. As a result, the AutoMate received a
8  "severe risk" rating. The AutoMate already had a software mechanism to halt the
9  decapping process if an operator opened the door while the decapper was in
10  operation. This is known as a "grey interlock." However, because of the "severe
11  risk" of operator injury in the event the software malfunctioned,  a "hard interlock"
12  was required.  A prototype circuit was developed to cut power and disable the
13  decapper from rotating when the decapper door was opened.  According to the
14  Senior Engineer, it was never installed in models in commercial operation.

15          **(iii)**    **Example # 3: The Recurring Non-Compliances of**
16                      **Beckman Products Exposed During Safety**
                    **Inspections**

17      65.  IDS's quality and compliance shortcomings were well known to
18  Beckman for years, and IDS-manufactured Beckman products frequently failed to
19  comply with all applicable safety standards when inspected by ETL inspectors.
20  "ETL" stands for Electrical Testing Laboratory, an organization now known as
21  Intertek Testing Services NA, Inc. ("Intertek").  Intertek is one of several
22  organizations recognized by the U.S. Department of Labor's Occupational Safety
23  & Health Administration ("OSHA") as a Nationally Recognized Testing
24  Laboratory ("NRTL").  As explained on the OSHA website, the NRTL Program
25  "recognizes private sector organizations as NRTLs, and recognition signifies that
26  an organization has met the necessary qualifications specified in the regulations for
27  the Program. The NRTL determines that specific equipment and materials

28