1   ('products') meet consensus-based standards of safety to provide the assurance,

2   required by OSHA, that these products are safe for use in the U.S. workplace."

3       66.    Among other things, NRTLs are hired by companies to inspect and

4   "certify" products.  Beckman contracted with ETL/Intertek to inspect Beckman

5   products, including those manufactured by IDS, that were installed at its

6   customers' locations.    According to the Senior Engineer, IDS-manufactured

7   Beckman products "frequently" were cited by ETL/Intertek inspectors for non-

8   compliances such as: (i) missing nameplate markings required to communicate

9   supply voltage, current, and frequency; (ii) missing "Caution" markings to alert

10  operators if a machine had more than one disconnect or if operator-accessible parts

11  moved automatically; (iii) component parts not being NRTL certified; and (iv)

12  missing top covers on storage units for patient samples.

13      67.    In 2008, the Senior Engineer was involved in discussions with IDS's

14  Quality Assurance group about creating a joint project to address IDS's regulatory

15  compliance shortcomings. The joint project was never undertaken because

16  Beckman lacked the manpower to staff it.

17          **(iv)    Example # 4: Safety Concerns With Respect To High
                      Leakage Currents**

18

19      68.    Another unresolved safety issue affecting numerous Beckman

20  products involved high "leakage currents."  High leakage currents are of concern

21  for operator safety.   If the grounding connection for electrical equipment is

22  interrupted, leakage current could shock the equipment operator.   A leakage

23  current of 3.5 milliamps ("mA") may cause a mild shock and some pain.  As the

24  leakage current increases, so does the danger of operator injury.  The Senior

25  Engineer explained that leakage current issues were common and identified several

26  instances in which Beckman management was alerted to problems that were never

27  resolved, including one relating to the Auto*Mate* 800 dating back to December

28  2007, another from June 2008 relating to Power Processors without an

1   uninterruptible power supply installed, and another from March 2009 regarding a
2   leakage current problem in connecting multiple IDS - manufactured modules
3   together (a likely scenario in commercial operations).   According to the Senior
4   Engineer, IDS assumed that the 3.5mA leakage current "limit" was applicable to
5   each separate module in a particular product line.   Connecting the modules created
6   a total leakage current that far exceeded acceptable limits.   Despite the dangers this
7   presented to operators, the issue was never addressed.

8          69.   In addition to the multiple examples of Beckman's quality, safety, and
9   compliance shortcomings, the former Senior Engineer also relayed that the
10  Company "played games" to affirmatively mislead the FDA with respect to the
11  complaints it received.   For instance, to make it appear that "Type 2" and "Type 3"
12  complaints were being addressed in a timely manner, Beckman would simply close
13  out old complaints, only to place them on another list to restart the clock.   Due to
14  Beckman's multiple rounds of layoffs, the Company lacked staff necessary to
15  respond to or otherwise process complaints in a timely fashion, causing a backlog.

16     **2.     Beckman Continued To Conceal Its Quality, Safety, And**
17          **Compliance Problems While Misleading The Investing Public**
18          **Concerning The Problems With Its Troponin Test Kit**

19             (i)   **The February 2010 Announcements: Beckman Issues**
                   **An "URGENT: PRODUCT CORRECTIVE**
20                 **ACTION" For Its Troponin Test Kit Yet Espouses**
                   **The Advantages Of Incumbency**
21

22         70.   In contrast to all the undisclosed quality, safety and compliance
23  problems Beckman had, one such problem became very public. It concerned the
24  Company's AccuTnI test kit for troponin.   On February 8, 2010, Beckman filed a
25  Form 8-K with the SEC, which stated in part:

26             On February 5, 2010, Beckman Coulter issued the
27             attached notice (the "Notice") advising customers who
28             use a UniCel DxI platform to perform AccuTnI testing

1          that values obtained with the DxI have been

2          demonstrated to have a positive bias compared to values

3          obtained when using an Access or Access 2 platform to

4          perform AccuTnI testing. We have identified some

5          approaches to resolve the issue and are working closely

6          with the FDA to select the most appropriate solution and

7          to determine next steps and timing. *We currently believe*

8          *this action will not have a material adverse affect on*

9          *our results of operations; however, we can not provide*

10         *any assurances at this time that the action will not have*

11         *material adverse effects on our business.*

12  (Emphasis added.)

13      71.   The Notice further advised customers that: **"Troponin I test results**

14  **when assayed with AccuTnI Reagent . . . run on the UniCel DxI system have**

15  **been shown to have a positive bias up to 48% when compared with results run**

16  **on the Access/Access 2 systems."** (Emphasis in original.)

17      72.   This was a quality problem, obviously, because the Company had

18  been marketing products that did not work as intended. It was also a safety

19  problem for patients; an incorrect result could lead to an incorrect diagnosis,

20  raising the possibility of exposing patients to unnecessary treatment.

21      73.   Significantly, and in keeping with the Company's shortcomings with

22  respect to quality, safety, and compliance, the Notice confirmed that Beckman was

23  not proactive but reactive. The Company did not alert its customers about the

24  AccuTnI problem until numerous customers alerted Beckman. The Notice begins

25  as follows:

26         Dear Beckman Coulter AccuTnI UniCel DxI Customer:

27         Issue:   Beckman Coulter *has confirmed customer*

28         *reports* that different results have been obtained using the

same patient samples on Access/Access 2 and UniCel
DxI platforms. Values obtained with UniCel DxI systems
have been demonstrated to have a positive bias compared
to values obtained with Access or Access 2 systems.

(Emphasis added.)

74.    On February 11, 2010, defendant Garrett reiterated the Company's belief that the action it was taking concerning the AccuTnI would not have a material impact on 2010 results while speaking during Beckman's fourth quarter earnings conference call.

75.    While the Company's AccuTnI announcement received only passing mention n the February 11, 2010 earnings call, another issue was discussed in more detail. Defendant Garrett spoke about the advantages of incumbency for device manufacturers such as Beckman, whose equipment and products become integral to their customers' workflow in delivering healthcare services.  The incumbency discussion arose in the context of a question from an analyst concerning lower volumes of OTL arrangements with customers.  Garrett's response, in pertinent part, was as follows:

[GARRETT]:  Sara, as you know the retention rates in
our industry are pretty high.  When customers come off
leases the incumbent really has an advantage.  So, as they
become reluctant to make a new commitment, it certainly
is to the advantage of incumbents.  Fortunately, we have
a pretty significant market share.

So I don't think we are losing anything, literally
not losing anything, and we are gaining business, but
probably a little bit slower.  In addition to that, we are
probably shipping fewer instruments to existing
customers. Not necessarily a bad thing because there is

1    still buying reagents, and they are still good customers.
2    So overall this could slow down share gains, but it really
3    shouldn't have a significant impact on the stability of our
4    install base or the productivity of our installed base.

5    76.    The Company also addressed the issue of incumbency in its Form 10-
6    Q for the third quarter of 2009 as follows:

7    Switching instrument systems creates significant
8    costs for labs: changing suppliers means re-training staff
9    on new systems and performing validation studies to
10   assure consistency of reported results.   High retention
11   rates have driven recurring revenue to approximately
12   83% of total revenue.  Our remaining balance of revenue
13   is derived from instrument sales.

14   77.    At the time of Garrett's exchange with the analyst on February 11,
15   2010, Beckman had, for a number of reasons, largely eviscerated its incumbency
16   advantage with its customers, and in particular with its larger customers.  First, the
17   work, costs, and uncertainties involved with switching instrument systems is an
18   advantage for the incumbent only if staying with the incumbent involves less work,
19   lower costs, and fewer uncertainties.  Critically, as Garrett acknowledged shortly
20   after the close of the Class Period, the inability of certain of its customers to run
21   AccuTnI tests on their DxI systems was "*more disruptive than any other test*
22   *would be in terms of its size, its importance to us, its importance to customers.*"
23   And because of Beckman's position as the "leaders in automation," Garrett further
24   acknowledged that "a test that moves off of automation that's used as -- *with the*
25   *importance and the frequency of Troponin disrupts the work flow greater than*
26   *others would*."  In other words, as a result of Beckman's advice to "immediately
27   discontinue" using the AccuTnI on DxI Systems, the customers experiencing the
28   greatest work flow disruptions would be among Beckman's most important, *i.e.*,

1  higher-volume institutions utilizing Beckman's DxI Systems and its laboratory
2  automation equipment.

3      78.    Second, Beckman had squandered its incumbency advantage because
4  its AccuTnI problem invited regulatory scrutiny. What began as a quality and
5  safety problem became a major compliance problem.  That compliance problem,
6  and the marketing restrictions that flowed from it, gave would-be immunoassay
7  customers little incentive to sign up with Beckman, and gave Beckman's existing
8  immunoassay customers a powerful incentive to take their business elsewhere.

9      79.    Third, while the Company talked about "quality" and "operating
10 excellence," the reality was that Beckman's quality, safety, and compliance
11 problems were adversely affecting its customers. This provided yet another
12 incentive for customers to either migrate to a competitor or extract significant
13 concessions from Beckman in exchange for an agreement to stay.  Either event
14 negatively impacts Beckman's recurring revenue stream.  The pervasiveness of the
15 Company's quality problems was the subject of a report by Jefferies & Co. dated
16 October 5, 2010.  While published after the close of the Class Period, it speaks
17 directly to the issue of Beckman having quality problems before its troponin
18 troubles became public:

19              **Event**
20              We checked in again with several BEC lab customers to
21              assess the state of BEC's franchise in the face of the
22              company's quality issues.  We continue to find evidence
23              of higher attrition among Immunoassay customers with
24              accounts up for renewal, while BEC's Chemistry
25              business shows signs of weakness.
26              **Key Points**
27              Checks with consultants reveal persistent [immunoassay]
28              problems.  ***Some consultants believe that BEC has not***

*been pumping enough resources into Immunoassay (IA) for some time – leading to service shortfalls and down-time issues. Even before FDA got involved, the Troponin I (TnI) assay was plagued by problems.* Consultants often express dissatisfaction with support provided by BEC reps and lack of adequate pricing incentives or alternate support solutions until BEC re-launches its assay. *Many consultants see TnI as a last straw after years of service deterioration and down-time problems.* (Emphasis added.)

80. Critically, the tremendous significance of the AccuTnI test to Beckman's immunoassay customer base, the risk of adverse action by the FDA, and the additional burdens Beckman was placing on its customers because of its own quality, safety, and compliance shortfalls were all known to Defendants (or they were deliberately reckless in not knowing of them) *before* the FDA's scrutiny of the AccuTnI ever occurred.

(ii)    **The March 2010 Announcements: Faced With A Material Adverse Impact On Its Recurring Revenue Stream, Beckman Discloses Only Possibilities**

81. On March 22, 2010, Beckman filed a Form 8-K with the SEC, which stated in part:

*FDA has indicated to us that it believes that certain modifications to our troponin test kits as used on DxI systems and as used on Access systems were made without obtaining appropriate product clearances from FDA.* Based upon our discussions with FDA we believe that *we will be required to impose further restrictions or conditions on the use of troponin test kits on DxI systems in the U.S., and those conditions will*

*likely include transitioning U.S. DxI customers to some other form of troponin testing until we can obtain 510k clearance from FDA for troponin testing on DxI.*

. . .

While we are not yet able to quantify the impact on our operating results of any new restrictions on the sale of our troponin test kits, *these matters may have a material adverse impact on our previously issued outlook for the full year 2010.*

(Emphasis added.)

82.   The Company also relayed its belief that it would likely be able to continue to supply Access System customers with AccuTnI kits when accompanied by appropriate notices and precautions, and that it "expect[ed] to seek 510k clearance for our troponin test kits for both the DxI and Access systems."

83.   The "510k clearance" discussed in the Company's 8-K is also known as "pre-market notification." It refers to Section 510(k) of the Federal Food, Drug, and Cosmetic Act, which is codified at 21 U.S.C. § 360(k). Before a manufacturer can legally market medical devices in the United States, Section 510(k) clearance by the FDA is required. The process is regulated by 21 CFR 807. The purpose of making a 510(k) submission is to demonstrate to the FDA that the device to be marketed is at least as safe and effective as (or "substantially equivalent" to) a device that is already legally marketed. A device is "substantially equivalent" if, in comparison to a predicate device, the device has the same intended use and technological characteristics as the predicate device or has the same intended use and has different technological characteristics but does not raise any new questions of safety and effectiveness and demonstrates that the device is at least as safe and effective as the predicate device.

84.   A new 510(k) is required for legally marketed devices when a change or modification is made and that change could significantly affect its safety or effectiveness (*e.g.* a significant change or modification in design, material, chemical composition, energy source, or manufacturing process). The burden of determining whether a change or modification could significantly affect the safety or effectiveness of a device is on the 510(k) holder.

85.   The Company's March 22, 2010 announcement that it "expect[ed] to seek 510k clearance" for the AccuTnI was all the more remarkable because just two weeks earlier, Garrett talked about how proactive Beckman was in navigating the 510(k) process with the FDA. On March 9, 2010, Garrett spoke at a Cowen Healthcare Conference with analysts, media representatives and investors. In response to a question concerning possible reform of the 510(k) process and its potential effect on Beckman's Clinical Diagnostics business, Garrett stated as follows:

> The question is, how is the 510(k) process with FDA likely to change, if at all? How does it affect Diagnostics?
>
> Diagnostics being a very data-driven business and data-oriented business, *I think the 510(k) process has been used very effectively in Diagnostics because every submission includes data.* We are not just showing a picture of a new valve or a catheter or something that requires approval; and you say, well, it works like the one that we had on the market three years ago.
>
> In Diagnostics it is all about data already, and the FDA has never been shy about asking for more data when we make submissions. So in discussions I've had with FDA I've suggested that – tell us what you want.

Most companies like ours will go very early in a product development project and say, here is the way we are going to design the clinicals; what do you think? So that we don't get surprised when we are making a submission and say, well, you really didn't do what we wanted you to in the clinicals. *You've got to get in there early, tell them what you are going to do.*

Therefore I think our industry is unlikely to be impacted in a big way by anything that changes in general in the 510(k) process. Because I think that in our industry it is still going to be all about data and getting to the FDA early in a project and saying, how do you think we should be designing these clinical studies? And do we need a clinical study?

*So I am not concerned so much about the 510(k) process.* I am concerned about staffing at FDA. Are they going to get way behind? Is that going to slow things down?

But in terms of the requirements, because we generate so much data on our products anyway I think we will be able to meet whatever requirements they might have. (Emphasis added.)

86.    On March 23, 2010, the day after issuing its Form 8-K, Beckman participated in a Barclays Capital Global Healthcare Conference with analysts, media representatives and investors, during which Defendant Slacik confirmed that "it looks like we are going to be severely constrained and possibly have to temporarily stop selling troponin on the DxI and possibly also have to temporarily stop promoting and marketing the troponin to the Access 2 users as well.   . . .

"[W]e may be constrained in terms of our ability to add new customers to our cardiac panel, which, of course, the troponin is a key marker in that panel."

87.    Beckman also chose to alter its quality-related messaging in its March 22, 2010 Form 8-K, but in doing so it still failed to disclose the existence or extent of the Company's longstanding and widespread problems, stating only that in light of previously disclosed issues concerning Beckman's troponin test kits and a recall relating to sodium testing on certain clinical chemistry analyzers, Beckman was "evaluating our internal processes and procedures regarding our product, quality and regulatory systems" and that it was "*possible* that more of our products *could* be affected and the actions with respect to those products *could* adversely affect our operating results." See ¶144 (March 22, 2010 Form 8-K) (Emphasis added.)

88.    Neither this announcement nor any other that preceded the Company's July 22, 2010 corrective disclosures alerted the investing public that long-standing quality and compliance problems in fact existed, and were so pervasive as to require the Company to divert resources away from "growth" opportunities to salvage Beckman's strained relationship with its disgruntled current customer base.

89.    Likewise, while Beckman's messaging on the troponin issue had migrated from "will not have a material adverse affect" in February 2010 to "may have a material adverse impact" in March 2010, Defendants knew or were deliberately reckless in not knowing of the materially negative impact of the Company's troponin-related quality and compliance problems on the Company's recurring revenue stream.   As discussed below, in May 2010, the Company disclosed that as a result of many conversations with its customers, it was "doing a lot of listening and a lot of learning."   There is a difference, however, between learning new information concerning an evolving problem and having an evolving learning curve with respect to a problem that is not new.  The problem Defendants caused their customers was not new – it was created when Beckman significantly

1  changed its AccuTnI test kit; only later, when erroneously elevated levels of
2  troponin required the Company to issue its Notice in February 2010 did Beckman's
3  self-inflicted problem publicly manifest itself.  In light of the disruptions Beckman
4  caused its customers, which ought to have been anticipated by Beckman given the
5  importance of the AccuTnI to its immunoassay customers base, materially negative
6  impact to its recurring revenue stream was entirely foreseeable:  each lost customer
7  would negatively impact Beckman's recurring revenue stream by eliminating
8  purchases for the AccuTnI, eliminating purchases for potentially scores of other
9  reagent test kits, and eliminating OTL payments for leased systems; customers
10 willing to stay would be in a position to extract significant concessions, and;
11 because the sales force would be so focused on limiting the loss of customers, little
12 effort would be spent seeking to gain new ones.

13        90.    When the market opened on March 23, 2010, Beckman's stock
14 opened at $66.00 per share, down $3.10 from it's $69.10 closing price on March
15 22, 2010, a 4.5% decline.  When the market closed on March 23, 2010 Beckman's
16 stock dropped an additional $1.78 to close at $64.22 per share on high volume,
17 down over 7% or $4.88 per share from the close on March 22, 2010.

18            **(iii)   The April 2010 Announcements: The Company Issues
                A Recall, Lowers Guidance, And Admits That It
19              Caused Its Customers "Considerable Frustration"**

20        91.    On April 12, 2010, Beckman filed a Form 8-K announcing a recall of
21 the troponin test kits from use on the DxI System (the "Recall"):

22              On April 7, 2010, Beckman Coulter issued the
23        attached notice (the "Notice") to customers who use our
24        AccuTnI troponin test kits on our UniCel DxI
25        immunoassay system. The Notice advises our United
26        States customers that **we are removing the AccuTnI
27        assay from use with the DxI system as of May 31,
28        2010**. . . . (Emphasis added.)

92.   The Form 8-K also noted the Company's belief that it would likely "be able to continue to provide troponin test kits with appropriate additional notices and precautions to U.S. customers who currently use Access systems for troponin testing. However, we can provide no assurances that FDA will continue to permit us to do so."  In addition, the Company repeated that it was unlikely to be able to market troponin test kits to U.S. labs not currently using Access systems to perform troponin testing until it obtained 510(k) clearance.

93.   On that same day, Morgan Stanley issued a report reacting to the news of the recall: "While not a clear sign that this issue is intensifying, this is an *incremental negative* as it remains unclear that today's news suggests this process with the FDA is nearing an end."(Emphasis added.)

94.   Sixteen days later, on April 28, 2010, Beckman issued a press release reporting its first quarter 2010 earnings results and adjustments to the Company's full year 2010 outlook. In addition to reporting first quarter revenue and earnings, the release further reported a reduction to the Company's outlook for full year 2010 to revenue in the range of $3.75 billion to $3.85 billion, down from December 2009 guidance of $3.8 billion to $3.9 billion.  The Company lowered its earnings guidance to $4.30 to $4.50 per share, down from December 2009 guidance of $4.40 to $4.55 per share.

95.   In the release, Beckman stated: "We are updating our full-year outlook based on the *present status of pending product compliance and quality matters* and taking into account current foreign exchange rates." (Emphasis added.)   Notably, the press release includes a discussion of the status of the troponin test kit problems, improvements to other products as a result of its quality improvement initiative, including the tests used for glucose and sodium testing on its LX and DxC chemistry systems, and the review by the Company of its 58 other immunoassay tests and customer complaint files. That discussion constituted the "present status of pending product compliance and quality matters" insofar as

1    Beckman's investors were concerned. The release did not disclose the existence of

2    Beckman's long-standing quality, safety, and compliance problems. Instead, it

3    reiterates what the Company announced on March 22, 2010 concerning Beckman's

4    evaluation of its internal processes and procedures, *i.e.*, that there was a possibility

5    that other products could be affected that might affect operating results.

6        96.    Shortly after the April 28, 2010 earnings release, Beckman hosted a

7    conference call for analysts, media representatives and investors, echoing

8    information contained in the earnings release regarding the troponin issues and the

9    overall review of its compliance and quality improvements initiatives. Rather than

10   disclosing the Company's widespread quality, safety, and compliance problems,

11   defendant Garrett again sought to position "quality" as a positive for the Company:

12           [GARRETT:] Before I move on with financial

13           results for the quarter, I will comment on the Company's

14           current product issues. Let me assure you, *we remain*

15           *committed and are heavily focused on quality and*

16           *compliance for the balance of 2010 and beyond. Quality*

17           *is the single most important function of every employee*

18           *at Beckman Coulter.*

19       97.    Garrett thereafter hinted at the degree to which Beckman's troponin

20   troubles were impacting its customer base, but then continued to paint a picture

21   that was much less bleak:

22           *We understand and regret that issues associated*

23           *with our products have disrupted some customer*

24           *operations and caused them considerable frustration.*

25                    *          *          *

26           [ANALYST:] Scott, with respect to the troponin

27           and customers and retention, you kind of made a

28           comment at the end that they're largely standing by you.

What's the feedback that you heard and do you anticipate retention rates will be where they normally are historical[ly] [sic] or are these disruptions causing any second thoughts, and then kind of an adjunct to that question, what are your expectations for the guidance of the year for DxI placements in the U.S.?

[GARRETT:] Well, we're not going to be specific about DxI placements, Quintin. *We believe that our customers are largely quite loyal to us. We expect to continue to have excellent retention rates*, and we're working very hard right now throughout our whole commercial organization to make sure our customers understand that we're taking this very seriously and working with them to make whatever transitions they make as smooth as possible, and so that we can bring them back to the DxI as quickly as possible. (Emphasis added.)

98.   After this news, Beckman stock *rose* $4.74 per share to close at $63.30 per share on April 29, 2010.   RBC Capital Markets issued a report commenting that favorable reaction to the earnings release was expected "given *minimal reductions in guidance*, some reassurance that the scope of assay problems may be limited, and a longer grace period for selling Troponin." (Emphasis added.)

(iv)   **The May Announcements: Troponin Restrictions On Marketing Are To Stretch Into 2011, And Beckman Admits That It Had "Mightily Annoyed" Its Customers**

99.   The Company began to further modify its messaging in May. With its first quarter 2010 10-Q, filed on May 5, 2010, the Company for the first time

1   alerted investors that the troponin-related problems could require withdrawing
2   product from the market until 510(k) clearances were obtained and of more dire
3   possible problems such as recalls, FDA enforcement actions, fines seizures,
4   consent orders, or injunctions.

5       100.   On May 14, 2010, Beckman filed a Form 8-K with the SEC that stated
6   that the FDA had "recently provided guidance on the type of information required
7   to be included in a 510(k) submission as well as the goal of any clinical studies for
8   troponin." What the FDA required was a prospective clinical trial, the results of
9   which would not be available until some time in the first half of 2011—a minimum
10  delay of more than seven months. On this news, Beckman's stock dropped from a
11  previous close of $61.09 to $58.85, a $2.24 drop, or 3.7%, on high volume.

12      101.   On May 19, 2010, Beckman participated in a Robert W. Baird Growth
13  Stock Conference for analysts, media representatives and investors, during which
14  Beckman Senior Vice President Paul Glyer commented on the importance of the
15  AccuTnI and the impact of its loss on Beckman's customers:

16          [GLYER:] All right, let me give you a quick
17          update on troponin and some of the challenges that we
18          have had with this particular test. . . .

19              It is a ***very, very important test***. . . .

20                  *       *       *

21              Obviously any time that you interrupt a customer's
22          workflow, that is at a minimum annoying. ***We have***
23          ***mightily annoyed our customers and for that we are***
24          ***deeply apologetic.***

25              So, so far, I'd say the customers have been quite
26          concerned. They've been very vocal. We've actually
27          been doing a lot of listening and a lot of learning on our
28          part, but we've made some, I think, some good progress

in building bridges of understanding with our customers.

(Emphasis added.)

### (v)   Other Class Period Events

102.   The Company's prior stated belief that it would be able to continue to market the AccuTnI to its Access customers was later confirmed in a June 1, 2010 Form 8-K, which stated in part: "FDA has now informed us that they intend to allow us to continue to provide the troponin test kits to customers currently using Access instruments for troponin testing throughout the period required to perform" the clinical trial required for 510(k) approval.  Three weeks later, on June 21, 2010, the FDA issued a warning letter (the "Warning Letter") to Beckman which stated that the FDA had learned that the Company was marketing the AccuTnI on the Access Immunoassay without marketing clearance or approval in violation of the Federal Food, Drug, and Cosmetic Act (the "Act"), and stating that the Beckman "made significant modifications that may affect the performance" of the AccuTnI without obtaining "marketing approval or clearance before offering your modified product for sale, which is a violation of the law."  The Warning Letter further stated that "AccuTnI on the Access Immunoassay System is *adulterated* under . . . the Act . . . because you do not have an approved application for premarket approval (PMA) in effect . . . or an approved application for an investigational device exemption (IDE) . . .  The device is also *misbranded* under . . . the Act . . . because you did not notify the agency of your intent to introduce the device into commercial distribution, as required by . . . the Act . . .". (Emphasis added.)

### C.   The July 22, 2010 Corrective Disclosures: The Truth Finally Emerges

103.   On July 22, 2010, after the markets closed, Beckman reported its second quarter 2010 earnings results.  In doing so, the Company finally disclosed that addressing quality and compliance issues required a significantly greater commitment of resources than it forecasted in April, and gave some insight into the scope and scale of the problems that needed fixing.  The Company also disclosed

1  that the impact of its troponin-related problems was greater than previously
2  disclosed. For the second quarter in a row, the Company reduced its full year
3  outlook. The Company's release quotes defendant Garrett, who said, in part:

**Management Commentary & Outlook**

\*      \*      \*

"Although customer satisfaction and service always has been a hallmark of Beckman Coulter, *recent compliance and quality challenges in the U.S. have prompted significant additional focus and investment in this area* to ensure that we live up to the standards our customers expect. We have conducted a detailed assessment of our quality system and completed hundreds of customer site visits and 18 regional meetings in the U.S. with another 200 customers. *We have identified root causes and developed remediation plans. Implementation is underway with some projects continuing through 2011.* With customer satisfaction and retention our foremost focus, *we have deferred some other initiatives pending resolution of the aforementioned issues.* In addition, rather than scale operating expenses to short-term revenue trends, we are instead increasing investment in our customer-facing personnel and operations to enhance customer satisfaction and drive future revenue growth. These investments are expected to continue through 2011," he said.

"First half 2010 results largely met our expectations, *but quality challenges in the U.S. market,* weakness in demand from life science markets and

reduced expectations for our cellular business, lead us to lower revenue and earnings expectations for the full year. ***Although we continue to gain new customers in the U.S., partially offsetting accounts lost, recurring revenue in the U.S. is expected to be relatively flat until our quality challenges are behind us.*** We expect constant currency recurring revenue growth, excluding Olympus, to be about 5%, comprised of about 1% growth for the U.S. and around 9% growth outside the U.S. We are now projecting total 2010 revenue of between $3.65 billion to $3.70 billion. For 2010, our operating margin should be approximately 12.7% due to lower recurring revenue growth, increased staffing in our customer facing organization, and a stronger U.S. dollar. Earnings per fully diluted share are expected to be between $3.90 to $4.00 per share. . . .

"We are working hard to address recent issues and are confident that, as we move through the second half of 2010 and restore affected customers to full value, we will emerge as an even better and stronger company. Despite the macroeconomic environment, our current challenges, and unfavorable currency trends, Beckman Coulter has a strong installed base of customers, an enviable new product pipeline, and a 75-year history of meeting the needs of customers," Garrett said.

104.   During the related earnings conference call, Garrett was asked about the reasons for changing the guidance downward two quarters in a row.

1    [ANALYST]: . . . Still, I am trying to get a better

2    sense of how the projections you gave just three months

3    ago were so far off, and just want that in order to better

4    assess how much stake we should put in the revised

5    outlook, and also to get a sense of what's really

6    happening out there in the field. *I mean, are we to*

7    *understand that when you set your previous guidance*

8    *you didn't expect that it was going to be just a little*

9    *harder to retain existing customers and win new*

10    *clients?* (Emphasis added)

11    105.   In his response, Garrett sought to minimize the effect that the

12    Company's quality and troponin-related had on the Company's downwardly

13    revised guidance, but the analyst was incredulous:

14    [GARRETT]: No, Bill, the biggest changes since

15    April were not changing in association with these acute

16    issues. There are changes in the cellular expectations

17    where just recently we found that the new products are

18    not being cleared as quickly as we expected and are not

19    going to be reaching the market when we thought they

20    would be. And, we also learned in the second quarter that

21    the life science expectations for the year would be far

22    below where they were.

23    If all we had to contend with was the consequences

24    of troponin, I don't think we would be anywhere near the

25    situation we're in right now. We are looking at Cellular

26    and Life Sciences as really the bigger news here.

27    [ANALYST]: *I'm not getting that at all.* I mean,

28    you changed your -- if I'm reading this slide right, what

1    you say on compliance and quality matters, the difference

2    is $0.25 on both the lower and the high end. So, I mean,

3    ***it seems like you've got a very different expectation than***

4    ***you had in April.*** (Emphasis added.)

5    106.   Citing "damaged management credibility," Cowen and Company

6  reported that "management acknowledged that the recent product recalls are

7  having a negative impact on customer retention and also slowing new customer

8  acquisitions (due to sales force pre-occupation with Troponin resolution)."

9    107.   RBC Capital Markets noted that "Beckman Coulter is losing share.

10 Customer retention rates have fallen from the high- to mid-80% range and

11 recurring revenue growth declined from 8.4% in Q1 to 3.2% in Q2. The share loss

12 is a direct fallout from the Troponin problems."

13   108.   A Jefferies report stated "BEC's product quality stumbles are clearly

14 hindering both new sales and customer retention."   Also "We believe this

15 substantial guide-down raises too many questions regarding the impact of recent

16 product recalls on the broader business and customer retention."

17   109.   Morgan Joseph reported that "[t]he company does not appear to have

18 a firm handle on the troponin issue.  Management cited difficulties with the U.S.

19 market and said it would need to beef up its regulatory and compliance efforts

20 beyond what it initially anticipated. Some new products are likely to be delayed.

21 Foreign exchange impact is more negative than the company had anticipated. . . .

22 The company plans to have the revised troponin assay back on the market around

23 July, 2011. But given the recent events, confidence is deteriorating around future

24 guidance. Our estimates are under review."

25   110.   The Company's shares were hammered by massive sales.  The closing

26 price of the Company's stock on July 22, 2010 was $59.90.  After the Company's

27 announcement, the stock opened on July 23, 2010 at $48.35 and closed at $47.26, a

28 one-day decline of $12.64, or 21%, on very high volume of 8,671,300 shares. The

1    stock closed down nearly 34% from its Class Period high of $71.20 on September
2    14, 2009.

3    **D.   Defendants' Statements During And After The July 22, 2010**
4    **Conference Call Raise A Strong Inference Of Scienter That Defendants**
5    **Knew Or Were Deliberately Reckless In Not Knowing That Their Class**
6    **Period Statements And Omissions Were Materially False And**
7    **Misleading**

8          111.   In addition to the allegations of scienter above, Defendants made a
9    number of statements during the July 22, 2010 earnings call and during the 2010
10   American Association for Clinical Chemistry conference held on July 27, 2010,
11   which give rise to a strong inference that Defendants acted knowingly, or at least
12   with deliberate recklessness, in making public statements during the Class Period
13   which concealed the existence of the Company's long-standing quality, safety, and
14   compliance problems and misled the investing public concerning the degree to
15   which the Company's troponin-related problems would adversely impact its
16   retention rates and recurring revenue stream.

17         112.   With respect to quality, safety, and compliance problems, the
18   following statements give rise to a strong inference that Defendants knew or with
19   deliberate recklessness disregarded that their prior public statements and omissions
20   were false and misleading:

21         • In recognition of a need for greater attention to and accountability
22           concerning quality, safety, and compliance functions, Defendants had
23           altered the Company's compensation structure in January 2010:
24           "Anybody who touches quality and compliance has roughly 50% of
25           their incentive compensation based on success on those quality and
26           regulatory metrics this year. That was in place as of the beginning of
27           the year."

28

- In recognition of a need to supplement Beckman's own deteriorated quality, safety, and compliance functions, Defendants had hired outside consultants: "Well, certainly we're [stepping] up investments, especially in the short term on quality and compliance . . . when you think of some of the consulting services we've brought in to help shore up our quality systems."

- In recognition of a need to supplement Beckman's own deteriorated quality, safety, and compliance functions, Defendants hired an executive level employee: "to be more keenly aware of FDA's expectations and requirements, and making sure that our decision processes, are reviewed and evaluation processes include that kind of insight. In immunoassay, we recently hired a new vice president of quality and regulatory affairs"

- In recognition of a need to increase controls over Beckman's deteriorated quality, safety and compliance functions, Defendants heightened Beckman's internal review processes:  "We have identified areas for improvement in our quality systems, we are responding to our current issues with a heightened level of regulatory compliance throughout the Company. We are adding resources to our quality systems and regulatory affairs function throughout the Company at all locations. We are conducting audits of our processes and procedures throughout the Company, so we are really looking to understand where, if any, some additional issues might be coming."

- In recognition of the difficulties that Beckman's quality, safety and compliance problems were causing its customers, Defendants disclosed that Garrett had been meeting with customers over the previous two months to try and assuage their concerns: "I've

personally met with over 100 customers face-to-face over the last 8
weeks."

- In recognition of the depth and breadth of the Company's prior
quality, safety, and compliance shortcomings, the Company was
taking numerous additional steps to address them:

    o "We have established a small customer advisory group
    that is going to help us assess opportunities and issues as
    they come up."

    o "We have a monthly newsletter updating our customers
    on the status of any issues that we might have."

    o "We are looking to improve our overall logistics
    capabilities and deliver products in keeping with what
    customers are expecting and expressing that they want."

    o "We have established a Back to Basics cleaning kit for
    the chemistry analyzer to help them get back to a
    baseline capability if they're having any issues with
    certain parts of the chemistry analyzer."

    o "So, we are also investing in more people to improve the
    live call rates for our hotline, adding personnel to
    increase responsiveness to all of our technical support
    functions and even our field service organization. We
    have made significant investments in field service, not
    only in people, but also technology."

    o [W]e have not only reviewed all of our regulatory
    compliance for current products, we are also going
    through all of our R[&]D processes and making sure we
    have regulatory input, quality input every step at the way,
    we're ramping up an area of our quality organization

1        that's really quality engineering and we're getting far

2        more of our talented engineers into that role to make sure

3        that as we develop products they are ready for prime time

4        when they're submitted."

5        113.   With respect to the Company's troponin-related problems and their

6    materially adverse impact on Beckman's retention rates and recurring revenue

7    stream, the following statements give rise to a strong inference that the

8    Defendants' knew or with deliberate recklessness disregarded that their prior

9    public statements and omissions were false and misleading:

10       •   In recognition of the unprecedented degree of disruption Beckman's

11          customers would be expected to experience and, in fact, experienced

12          as a result of Beckman's inability to market the AccuTnI to certain of

13          its customers: "Troponin is a very special test, one that we've used to

14          differentiate our immuno assay system for quite a while.  We have a

15          40% market share in the US and therefore, it's -- it's the -- it's – ***it's***

16          ***more disruptive than any other test would be in terms of its size, its***

17          ***importance to us, its importance to customers.***  In addition, when you

18          think about Beckman Coulter's position in immuno assay, you have to

19          remember that we're the leaders in automation, so a test that moves off

20          of automation that's used as -- ***with the importance and the***

21          ***frequency of Troponin disrupts the work flow greater than others***

22          ***would.***"  (Emphasis added.)

23       •   In recognition of the difficulties involved with preserving existing

24          customer relationships, Defendants knew that the attention of the

25          Company's sales force had been dedicated during the Class Period to

26          trying to salvage existing customers rather than pursuing new ones:

27          o   The "sales force has been very busy in the last three to

28             four months doing a lot of customer handholding … It's