1    *a huge distraction and obviously at the same time, it's*

2    *competitively more difficult too.*" (Emphasis added).

3    o "Our sales force is focusing the majority of its efforts on

4    customer satisfaction and quality issues."

5    o "U.S. sales force is focused on customer retention and

6    satisfaction causing a slowdown in new customer

7    additions."

8    o "We have a pretty well established process and literally a

9    system that we refer to as Salesforce.com, which includes

10   an assessment of prospects and the potential vulnerability

11   of customers. We rate them several times a month as to

12   whether we're progressing through the sales final, or

13   whether we're moving into a more difficult situation on

14   an existing customer."

15   • In recognition of the difficulties that Beckman's larger customers who

16   utilize its DxI System and automation equipment faced as a result of

17   the Company's "product corrective action" and the FDA's regulatory

18   action, Defendants were concerned over their ability to retain these

19   important customers: "[A]s some of these largest accounts come off

20   contract, those are the ones who have probably seen the most

21   disruptions from the troponin issue and those are the ones that we're

22   most concerned about."

23   **E.    Defendants' False and Misleading Statements**

24   114.   Throughout the Class Period, Beckman filed reports with the SEC on

25   Forms 10-K, 10-Q, and 8-K, and issued public announcements, and the Individual

26   Defendants issued public announcements and spoke on conference calls and in

27   meetings with stock analysts, media representatives and investors on Beckman's

28   behalf.   These filings, announcements and other communications contained

materially false and misleading statements and actionable omissions concerning: (i) the Company's long-standing safety, compliance, and quality problems; (ii) the significant changes the Company made to its AccuTnI test kit; (iii) the risks associated with adverse action being taken by the FDA in response to the Company's significant changes to its AccuTnI test kit, and; (iv) the effects of the foregoing on the Company's growth, customer retention rates, and revenue stream. Defendants' statements and omissions gave the affirmative impression that Beckman was conforming to legitimate and sustainable business activities, a state of affairs that differed in a material way from that which actually existed.

**1.    The July 30, 2009 Form 8-K, Press Release and Earnings Call:**

115.    In a press release issued and attached to a Form 8-K filed with the SEC on July 30, 2009, Beckman reported its second quarter 2009 financial results. The release further provided in pertinent part:

> Scott Garrett, chairman, president and chief executive officer, said, "The excellent first half results demonstrate **the resilience of our recurring revenue business model** and enable us to improve full year earnings outlook to between $3.76 and $3.91 per share."
>
> *            *            *
>
> ***We remain committed to providing quality service to customers, aggressively managing expenses and delivering on our earnings goals.*** Operating margin, now including normal hedging activities, is anticipated to be around 13%. Adjusted non-operating expense, now excluding normal hedging activities, should be around $62 million. Based on a full year tax rate of 26% to 27%, our outlook for adjusted earnings per fully diluted share is improved to $3.76 to $3.91. We are revising our

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 8:10-CV-1327-JST (RNBx)

48

expectations for capital expenditures to between $325 and $350 million, but continue to expect depreciation and amortization to be between $270 and $290 million. ***Despite a challenging operating environment, we expect to continue solid recurring revenue growth and determined expense management.*** . . .

116. During the related earnings conference call on the same day, Defendant Garret stated:

As I review our results, four key observations stand out and characterize the quarter. ***Number one, solid recurring revenue growth, signaling stability and driving gross profit growth.*** Excluding the impact of currency and our Cogenics acquisition, recurring revenue grew 7%, right in line with our full year expectations. Number two, weaker cash instrument sales, weaker than originally anticipated for the second quarter and the first half.

\*      \*      \*

And Beckman Coulter continues to be a leader in work cell solutions, with unit placement up more than 10% for the sixth consecutive quarter. Our work cells combine the full menu of Chemistry and Immunoassay tests into consolidated systems, ***bringing higher levels of productivity, quality, and safety to the laboratory.*** These consolidated systems also enable us to leverage our Chemistry position to increase Immunoassay penetration, supporting continued above-market Immunoassay growth. (Emphasis added.)

117.   The above-referenced statements from Beckman's July 30, 2009 Form 8-K, Press Release and Earnings Call were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)   Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)   Beckman's AccuTnI test kit, when run on DxI Systems, had a positive bias compared to values obtained when using Access Systems (*see* ¶¶70-73);

(c)   The risk that the AccuTnI test kit's positive bias on DxI Systems would disrupt the work flow of Beckman's customers more than a bias would with any other immunoassay reagent test posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89);

(d)   Beckman made significant changes to its AccuTnI test kit without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

(e)   The risk that adverse action by the FDA with respect to the AccuTnI test kit would disrupt the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89);

(f)   in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of Beckman's operations, products, and prospects, and;

(g)   in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of the strength or resilience of Beckman's business model.

**2.     The August 3, 2009 Form 8-K and Press Release**

118.   In a press release issued and attached to a Form 8-K filed with the SEC on August 3, 2009, Garrett touted Beckman's opportunity for growth of its immunoassay business and its new ability to cross-market with Olympus' chemistry customers. "The completion of this transaction adds considerable product depth and significantly expands our geographic reach and scale. We are confident that the combination of Olympus diagnostics with our business will provide many cross-selling opportunities – the most compelling being promotion of Beckman Coulter's leading Immunoassay products to the loyal base of Olympus' chemistry customers. *We remain focused on creating shareholder value through growth, quality and operating excellence.* This acquisition demonstrates Beckman Coulter's commitment to further extend our leadership position in chemistry and sustain our above-market growth in immunoassay." (Emphasis added.)

119.   The above-referenced statements from Beckman's August 3, 2009 Form 8-K and Press Release were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)   Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)   Beckman's AccuTnI test kit, when run on DxI Systems, had a positive bias compared to values obtained when using Access Systems (*see* ¶¶70-73);

1           (c)   The risk that the AccuTnI test kit's positive bias on DxI

2   Systems would disrupt the work flow of Beckman's customers more than a bias

3   would with any other immunoassay reagent test posed a material risk to

4   Beckman's recurring revenue stream, particularly the recurring revenues generated

5   by Beckman's larger customers who utilized the DxI Systems and/or Beckman's

6   automation instruments (*see* ¶¶37-46, 77-80, 89);

7           (d)   Beckman made significant changes to its AccuTnI test kit

8   without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

9           (e)   The risk that adverse action by the FDA with respect to the

10   AccuTnI test kit would disrupt the work flow of Beckman's customers more than

11   marketing any other immunoassay reagent test without marketing approval or

12   clearance would, posed a material risk to Beckman's recurring revenue stream,

13   particularly the recurring revenues generated by Beckman's larger customers who

14   utilized the DxI Systems and/or Beckman's automation instruments, (*see* ¶¶37-46,

15   77-80, 89)and ;

16           (f)   in light of (a)-(e), above, the opportunities purportedly

17   generated by the acquisition of Olympus were misleading measures of Beckman's

18   operations, products, and prospects.

19       **3.**   **The August 5, 2009 Form 10-Q**

20       120.   On August 5, 2009, Beckman filed its Form 10-Q for the second

21   quarter of 2009. Therein, Beckman stated: "Our strategic initiatives for 2009 focus

22   on key growth drivers, quality and operating excellence . . .".

23       121.   The above-referenced statement from Beckman's August 5, 2009

24   Form 10-Q were materially false and misleading and omitted to state material facts

25   necessary to make the statement contained therein not misleading at all times

26   throughout the Class Period because:

27

28

1         (a)    Beckman had long-standing, undisclosed, quality, safety, and

2   compliance problems, which were exacerbated by several rounds of layoffs (*see*

3   ¶¶5, 53-69, 79);

4         (b)    Beckman's AccuTnI test kit, when run on DxI Systems, had a

5   positive bias compared to values obtained when using Access Systems (*see* ¶¶70-

6   73);

7         (c)    The risk that the AccuTnI test kit's positive bias on DxI

8   Systems would disrupt the work flow of Beckman's customers more than a bias

9   would with any other immunoassay reagent test posed a material risk to

10  Beckman's recurring revenue stream, particularly the recurring revenues generated

11  by Beckman's larger customers who utilized the DxI Systems and/or Beckman's

12  automation instruments (*see* ¶¶37-46, 77-80, 89), and;

13        (d)    Beckman made significant changes to its AccuTnI test kit

14  without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103).

15      **4.**    **The October 29, 2009 Form 8-K, Press Release and Earnings Call**

16      122.   In a press release issued and attached to a Form 8-K filed with the

17  SEC on October 29, 2009, Beckman reported its third quarter 2009 earnings

18  results, providing, in pertinent part:

19          Scott Garrett, Chairman, President and Chief

20          Executive Officer, said, "In the quarter, we completed the

21          Olympus transaction extending our leadership position in

22          the Chemistry and Clinical Automation product area.

23          Recurring revenue accounted for 82% of total revenue in

24          the quarter and grew 7.7% on a constant currency basis,

25          excluding the Olympus acquisition. Olympus added 9.6%

26          of incremental growth to recurring revenue. Clinical

27          Diagnostics experienced strong growth in recurring

28          revenue especially in Access Immunoassay, which again

1  grew more than 10%. ***Recurring revenue growth attests***

2  ***to the ongoing strength of our business model even in a***

3  ***difficult economic environment***." (Emphasis added.)

4     123.  On the same day, Beckman held an earnings conference call in which

5  Defendant Garrett continued to remark on the Company's recurring revenue and

6  the benefits of the Olympus transaction:

7        We have a solid foundation for continuing

8        recurring revenue growth including an expanding base in

9        emerging markets and excellent growth in immunoassay

10        driven by a steady stream of new instruments and new

11        tests.

12              \*     \*     \*

13        So all in all we expect Olympus to be a highly

14        strategic acquisition, positioning us for long-term

15        leadership and quickly improving our profitability. . . .

16        ***We remain focused on creating shareholder value***

17        ***through growth, quality and operating excellence.***

18        Beckman Coulter is committed to further exten[d] our

19        leadership position in clinical diagnostics and sustain our

20        above market growth. (Emphasis added.)

21     124.  On that same call, Garrett also explained that Beckman was already

22  able to take advantage of the Olympus transaction and that they were already able

23  to cross-sell with the DxI System:

24        We are getting good integration within the sales

25        force. We are beginning to cross train and cross-sell. We

26        are rapidly taking down the relatively small number of

27        immunoassay placements that Olympus had out there and

28        replacing them with DxI's which gives us an opportunity

1   to sell a much bigger menu of assays. And we are already

2   getting very, very close to some significant wins with the

3   ultra high throughput Olympus analyzers. . . .

4   125.   The above-referenced statements from Beckman's October 29, 2009

5   Form 8-K, Press Release and Earnings Call were materially false and misleading

6   and omitted to state material facts necessary to make the statements contained

7   therein not misleading at all times throughout the Class Period because:

8   (a)   Beckman had long-standing, undisclosed, quality, safety, and

9   compliance problems, which were exacerbated by several rounds of layoffs (*see*

10   ¶¶5, 53-69, 79);

11   (b)   Beckman's AccuTnI test kit, when run on DxI Systems, had a

12   positive bias compared to values obtained when using Access Systems (*see* ¶¶70-

13   73);

14   (c)   The risk that the AccuTnI test kit's positive bias on DxI

15   Systems would disrupt the work flow of Beckman's customers more than a bias

16   would with any other immunoassay reagent test posed a material risk to

17   Beckman's recurring revenue stream, particularly the recurring revenues generated

18   by Beckman's larger customers who utilized the DxI Systems and/or Beckman's

19   automation instruments (*see* ¶¶37-46, 77-80, 89);

20   (d)   Beckman made significant changes to its AccuTnI test kit

21   without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

22   (e)   The risk that adverse action by the FDA with respect to the

23   AccuTnI test kit would disrupt the work flow of Beckman's customers more than

24   marketing any other immunoassay reagent test without marketing approval or

25   clearance would, posed a material risk to Beckman's recurring revenue stream,

26   particularly the recurring revenues generated by Beckman's larger customers who

27   utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,

28   77-80, 89);

(f)     in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of Beckman's operations, products, and prospects;

(g)     in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of the strength or resilience of Beckman's business model, and;

(h)     in light of (a)-(e), above, the opportunities purportedly generated by the acquisition of Olympus were misleading measures of Beckman's operations, products, and prospects.

**5.     The November 4, 2009 Oppenheimer & Co. Healthcare Conference**

126.   On November 4, 2009, Beckman participated in the Oppenheimer & Co. Healthcare Conference.  Defendant Garrett spoke of the importance of the Company's recurring revenue, stating in part:

> And now going into some of the financials, looking at the revenue trend, the most important factor to think about is recurring revenue in our business. We've had a very steady 6% to 7% to 8% to 9% growth rate in recurring revenue over the last several years. In fact, we've even topped that a few times. That really represents how big the installed base is, reflects the size of the installed base and the utilization of the installed base. ***The only way we can grow recurring revenue is by selling more tests through the existing installed base or by expanding the installed base.*** (Emphasis added.)

127.   Defendant Garrett continued to speak about the Company's growth strategy:

1    Now looking to our growth strategy, creating value for
2    customers, creating value for shareholders, **we create**
3    **value through growth, quality and operating excellence**.
4    Growth by differentiation with our systems, growth by
5    expanding our served market, quality in terms of the
6    customer support that we provide to our customers all
7    over the world, and operating excellence as we drive that
8    way throughout our business process and generate
9    excellent returns. (Emphasis added.)

10   128.   The above-referenced statements by Beckman at the November 4,
11   2009 Oppenheimer & Co. Healthcare Conference were materially false and
12   misleading and omitted to state material facts necessary to make the statements
13   contained therein not misleading at all times throughout the Class Period because:

14   (a)   Beckman had long-standing, undisclosed, quality, safety, and
15   compliance problems, which were exacerbated by several rounds of layoffs (*see*
16   ¶¶5, 53-69, 79);

17   (b)   Beckman's AccuTnI test kit, when run on DxI Systems, had a
18   positive bias compared to values obtained when using Access Systems (*see* ¶¶70-
19   73);

20   (c)   The risk that the AccuTnI test kit's positive bias on DxI
21   Systems would disrupt the work flow of Beckman's customers more than a bias
22   would with any other immunoassay reagent test posed a material risk to
23   Beckman's recurring revenue stream, particularly the recurring revenues generated
24   by Beckman's larger customers who utilized the DxI Systems and/or Beckman's
25   automation instruments (*see* ¶¶37-46, 77-80, 89);

26   (d)   Beckman made significant changes to its AccuTnI test kit
27   without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

28

1    (e)    The risk that adverse action by the FDA with respect to the
2  AccuTnI test kit would disrupt the work flow of Beckman's customers more than
3  marketing any other immunoassay reagent test without marketing approval or
4  clearance would, posed a material risk to Beckman's recurring revenue stream,
5  particularly the recurring revenues generated by Beckman's larger customers who
6  utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,
7  77-80, 89);

8    (f)    in light of (a)-(e), above, past revenues, earnings, sales, or
9  growth in Beckman's immunoassay business were misleading measures of
10  Beckman's operations, products, and prospects, and;

11    (g)    in light of (a)-(e), above, past revenues, earnings, sales, or
12  growth in Beckman's immunoassay business were misleading measures of the of
13  the strength or resilience of Beckman's business model.

14    **6.    The November 5, 2009 Form 10-Q**

15    129.    On November 5, 2009, Beckman filed its Form 10-Q for the third
16  quarter of 2009. Therein, Beckman again stated: "Our strategic initiatives for 2009
17  focus on key growth drivers, quality and operating excellence . . .". Beckman also
18  explained the benefits of the Olympus transaction, including the Company's ability
19  to cross-market its immunoassay business with Olympus' clinical chemistry
20  customers:

21        [W]e have had success selling immunoassay to our
22        chemistry customers. We have the same opportunity to
23        continue our above-market growth in immunoassay by
24        selling our immunoassay products to an entirely new
25        base of loyal [Olympus Diagnostic Systems] chemistry
26        customers. Our strength in total lab automation should be
27        complemented by ODS' strong pre-analytical automation
28        position in Europe and Asia. Customers should benefit

from the expanded range of products, ***particularly those large hospital and university laboratories where higher throughput systems are preferred. This acquisition is classified as part of our Clinical Diagnostics business segment***. (Emphasis added.)

130.   The above-referenced statements from Beckman's November 5, 2009 Form 10-Q were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)   Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)   Beckman's AccuTnI test kit, when run on DxI Systems, had a positive bias compared to values obtained when using Access Systems (*see* ¶¶70-73);

(c)   The risk that the AccuTnI test kit's positive bias on DxI Systems would disrupt the work flow of Beckman's customers more than a bias would with any other immunoassay reagent test posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89);

(d)   Beckman made significant changes to its AccuTnI test kit without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

(e)   The risk that adverse action by the FDA with respect to the AccuTnI test kit would disrupt the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who

utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89);

       (f)    in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of Beckman's operations, products, and prospects, and;

       (g)    in light of (a)-(e), above, the opportunities purportedly generated by the acquisition of Olympus were misleading measures of Beckman's operations, products, and prospects.

**7.    The December 17, 2009 Form 8-K, Press Release and Annual Business Review**

131.  December 17, 2009, Beckman issued a press release providing its preliminary outlook for 2010, that stated in part:

> Scott Garrett, chairman, president and chief executive officer, said, "Despite broad uncertainties throughout the world economy, *the strength of our business model* and the accretive affects of our Olympus (ODS) acquisition position us to achieve mid-teens earnings growth in 2010. While no company is fully insulated from vulnerable and volatile world markets, *our stable installed base, which generates solid recurring revenue growth combined with our intensified focus on operating excellence, is expected to drive achievement of our earnings outlook.*" (Emphasis added.)

132.  At the December 17, 2009 Annual Business Review, Beckman also mentioned the strength and stability of its business model: "We've got an *attractive and very resilient business model. We have a large, stable installed base in instruments, most of which have been placed on an operating type lease,*

1    ***generating recurring revenue from those lease payments***, but even more so from
2    reagents, supplies and service." (Emphasis added.)

3        133. The above-referenced statements from Beckman's December 17, 2009
4    Form 8-K, Press Release and Annual Business Review were materially false and
5    misleading and omitted to state material facts necessary to make the statements
6    contained therein not misleading at all times throughout the Class Period because:

7            (a)    Beckman had long-standing, undisclosed, quality, safety, and
8    compliance problems, which were exacerbated by several rounds of layoffs (*see*
9    ¶¶5, 53-69, 79);

10           (b)    Beckman's AccuTnI test kit, when run on DxI Systems, had a
11   positive bias compared to values obtained when using Access Systems (*see* ¶¶70-
12   73);

13           (c)    The risk that the AccuTnI test kit's positive bias on DxI
14   Systems would disrupt the work flow of Beckman's customers more than a bias
15   would with any other immunoassay reagent test posed a material risk to
16   Beckman's recurring revenue stream, particularly the recurring revenues generated
17   by Beckman's larger customers who utilized the DxI Systems and/or Beckman's
18   automation instruments (*see* ¶¶37-46, 77-80, 89);

19           (d)    Beckman made significant changes to its AccuTnI test kit
20   without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

21           (e)    The risk that adverse action by the FDA with respect to the
22   AccuTnI test kit would disrupt the work flow of Beckman's customers more than
23   marketing any other immunoassay reagent test without marketing approval or
24   clearance would, posed a material risk to Beckman's recurring revenue stream,
25   particularly the recurring revenues generated by Beckman's larger customers who
26   utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,
27   77-80, 89);

28

(f)   in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of Beckman's operations, products, and prospects;

(g)   in light of (a)-(e), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of the strength or resilience of Beckman's business model, and;

(h)   in light of (a)-(e), above, the opportunities purportedly generated by the acquisition of Olympus were misleading measures of Beckman's operations, products, and prospects.

**8.     The February 8, 2010 Form 8-K**

134.   On February 8, 2010, Beckman filed a Form 8-K with the SEC, which stated in part:

> On February 5, 2010, Beckman Coulter issued the attached notice (the "Notice") advising customers who use a UniCel DxI platform to perform AccuTnI testing that values obtained with the DxI have been demonstrated to have a positive bias compared to values obtained when using an Access or Access 2 platform to perform AccuTnI testing. We have identified some approaches to resolve the issue and are working closely with the FDA to select the most appropriate solution and to determine next steps and timing. *We currently believe this action will not have a material adverse affect on our results of operations; however, we can not provide any assurances at this time that the action will not have material adverse effects on our business.* (Emphasis added.)

135.   The above-referenced statements from Beckman's February 8, 2010 Form 8-K were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)   Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)   The AccuTnI test kit's positive bias on DxI Systems disrupted the work flow of Beckman's customers more than a bias would with any other immunoassay reagent test, materially adversely impacting Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(c)   Beckman made significant changes to its AccuTnI test kit without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103); and;

(d)   The risk that adverse action by the FDA with respect to the AccuTnI test kit would disrupt the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (see ¶¶37-46, 77-80, 89).

**9.   The February 11 Form 8-K, Press Release and Earnings Call**

136.   In a press release issued and attached to a Form 8-K filed with the SEC on February 11, 2009, Beckman reported its fourth quarter and full year 2009 earnings results. The release further provided in pertinent part, the following statements by Garrett:

**Full Year 2010 Outlook**

\*       \*       \*

"I continue to be enthusiastic about our company, the stability of our sector and our growth opportunities. *The successful completion of the Olympus transaction extends our leadership position in Chemistry and Clinical Automation as well as strengthens our relative position on a geographic basis.* As we conclude the fourth year of our leasing transition, cash flows have improved as evidenced by free cash flow of $238 million, enabling significant expansion of R&D investment as well as our share repurchase program.

"*We continue to leverage our channel presence and customer relationships to pursue many significant long-term growth opportunities including China, Immunoassay and Cellular Analysis.* We are confident in our ability to deliver on our value proposition as we work with our customers to improve patient health and reduce the cost of care. Going forward we anticipate steady returns for our shareholders *driven by our focus on growth, quality and operating excellence,*" concluded Garrett. (Emphasis added.)

137. After issuing its fourth quarter and full year 2009 financial results, Beckman hosted a conference call for analysts, media representatives and investors on February 11, 2010, during which Defendant Garrett represented the following:

[GARRETT:] As you may know, we sent a letter to our customers earlier this week concerning a positive bias in our troponin test when run on a DXI

Immunoassay system. We have identified several potential approaches to resolve the situation and are working with the FDA to identify and [sic] appropriate solution, including next steps in timing.

Based on our customers' reactions over the past three days, we haven't changed our assessment of the situation, and **don't currently believe it will have a material impact on our 2010 results**. So overall, our core diagnostics business remains strong, and Olympus further bolsters our position. Our large installed base of instruments remains stable and productive, as evidenced by our steady recurring revenue growth.

\*     \*     \*

As we enter our 75th year, Beckman Coulter is committed to further extend our leadership position in clinical diagnostic and sustain our above market growth. We are confident in our ability to deliver on our value proposition as we work with our customers to improve patient health, and reduce the cost of care. Going forward, we anticipate steady returns for our share holders driven by **our focus on growth, quality and operating excellence**. Charlie and I are now prepared to take your questions.

\*     \*     \*

[ANALYST:] Okay. Then just one last one on the advisory notice. Understanding it's not material in the near term, but was this something that was picked up pretty quickly, and I guess from a quality control

1    perspective, is there anything that you are going to

2    potentially change going forward or is this pretty

3    standard?

4        [GARRETT:] As we mentioned in the comments

5    just now, we are working with the FDA to resolve the

6    issue. *We don't currently believe it will have a material*

7    *impact on 2010*. And, as we learn more, we will keep

8    you posted. (Emphasis added.)

9    138.   The above-referenced statements from Beckman's February 11 Form

10   8-K, Press Release and Earnings Call were materially false and misleading and

11   omitted to state material facts necessary to make the statements contained therein

12   not misleading at all times throughout the Class Period because:

13       (a)    Beckman had long-standing, undisclosed, quality, safety, and

14   compliance problems, which were exacerbated by several rounds of layoffs (*see*

15   ¶¶5, 53-69, 79);

16       (b)    The AccuTnI test kit's positive bias on DxI Systems disrupted

17   the work flow of Beckman's customers more than a bias would with any other

18   immunoassay reagent test, materially adversely impacting Beckman's recurring

19   revenue stream, particularly the recurring revenues generated by Beckman's larger

20   customers who utilized the DxI Systems and/or Beckman's automation instruments

21   (*see* ¶¶37-46, 77-80, 89, 97, 101);

22       (c)    Beckman made significant changes to its AccuTnI test kit

23   without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

24       (d)    The risk that adverse action by the FDA with respect to the

25   AccuTnI test kit would disrupt the work flow of Beckman's customers more than

26   marketing any other immunoassay reagent test without marketing approval or

27   clearance would, posed a material risk to Beckman's recurring revenue stream,

28   particularly the recurring revenues generated by Beckman's larger customers who

1  utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,
2  77-80, 89);

3      (e)   in light of (a)-(d), above, past revenues, earnings, sales, or
4  growth in Beckman's immunoassay business were misleading measures of
5  Beckman's operations, products, and prospects;

6      (f)   in light of (a)-(d), above, past revenues, earnings, sales, or
7  growth in Beckman's immunoassay business were misleading measures of the
8  strength or resilience of Beckman's business model, and;

9      (g)   in light of (a)-(d), above, the opportunities purportedly
10  generated by the acquisition of Olympus were misleading measures of Beckman's
11  operations, products, and prospects.

12      **10.   The February 22, 2010 Form 10-K**

13      139.   On February 22, 2010, Beckman filed its 2009 Form 10-K. Therein,
14  Beckman continued to tout its commitment to quality and compliance: "Our
15  strategic initiatives for 2010 continue ***our focus on growth, quality and operating***
16  ***excellence . . .***". (Emphasis added.)

17      140.   Beckman also disclosed its recognition of the requirements to
18  establish quality systems and procedures and monitor the Company's compliance
19  with them:

20          We are required to establish a quality system that
21          includes procedures for ensuring regulated products are
22          developed, manufactured and distributed in accordance
23          with specified standards. We also must establish
24          procedures for investigating and responding to customer
25          complaints regarding the performance of regulated
26          products.

27      141.   The above-referenced statements from Beckman's February 22,
28  2010 Form 10-K were materially false and misleading and omitted to state material

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 8:10-CV-1327-JST (RNBx)

67

facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)     Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)     The AccuTnI test kit's positive bias on DxI Systems disrupted the work flow of Beckman's customers more than a bias would with any other immunoassay reagent test, materially adversely impacting Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(c)     Beckman made significant changes to its AccuTnI test kit without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

(d)     The risk that adverse action by the FDA with respect to the AccuTnI test kit would disrupt the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, posed a material risk to Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89);

(e)     in light of (a)-(d), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of Beckman's operations, products, and prospects;

(f)     in light of (a)-(d), above, past revenues, earnings, sales, or growth in Beckman's immunoassay business were misleading measures of the strength or resilience of Beckman's business model, and;

(g)     in light of (a)-(d) above, the Company's statements concerning what Beckman is "required to" or "must" establish its products and customer

1   complaints affirmatively created an impression that Beckman was conforming to
2   such requirements and thereby conforming to legitimate and sustainable business
3   activities, a state of affairs that differed in a material way from that which actually
4   existed.

5   **11.   The March 9, 2010 Cowen Healthcare Conference**

6   142.   At the March 9, 2010 Cowen Healthcare Conference, in response to a
7   question concerning possible reform of the 510(k) process and its potential effect
8   on Beckman's Clinical Diagnostics business, Garrett stated as follows:

> Diagnostics being a very data-driven business and
> data-oriented business, *I think the 510(k) process has*
> *been used very effectively in Diagnostics because every*
> *submission includes data.* We are not just showing a
> picture of a new valve or a catheter or something that
> requires approval; and you say, well, it works like the
> one that we had on the market three years ago.

> In Diagnostics it is all about data already, and the
> FDA has never been shy about asking for more data
> when we make submissions. *So in discussions I've had*
> *with FDA I've suggested that – tell us what you want.*

> *Most companies like ours will go very early in a*
> *product development project and say, here is the way we*
> *are going to design the clinicals; what do you think? So*
> *that we don't get surprised when we are making a*
> *submission and say, well, you really didn't do what we*
> *wanted you to in the clinicals. You've got to get in there*
> *early, tell them what you are going to do.*

> *Therefore I think our industry is unlikely to be*
> *impacted in a big way by anything that changes in*

1        *general in the 510(k) process. Because I think that in*

2        *our industry it is still going to be all about data and*

3        *getting to the FDA early in a project and saying, how do*

4        *you think we should be designing these clinical studies?*

5        *And do we need a clinical study?*

6          *So I am not concerned so much about the 510(k)*

7        *process. I am concerned about staffing at FDA. Are*

8        *they going to get way behind? Is that going to slow*

9        *things down?* (Emphasis Added.)

10     143.  The above-referenced statements from Beckman's March 9, 2010

11 Cowen Healthcare Conference were materially false and misleading and omitted to

12 state material facts necessary to make the statements contained therein not

13 misleading at all times throughout the Class Period because:

14     (a)   Beckman made significant changes to its AccuTnI test kit

15 without obtaining the appropriate product clearance from the FDA (*see* ¶¶81, 103);

16     (b)   The risk that adverse action by the FDA with respect to the

17 AccuTnI test kit would disrupt the work flow of Beckman's customers more than

18 marketing any other immunoassay reagent test without marketing approval or

19 clearance would, posed a material risk to Beckman's recurring revenue stream,

20 particularly the recurring revenues generated by Beckman's larger customers who

21 utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,

22 77-80, 89), and;

23     (c)   the Company's statements concerning its utilization of the

24 510(k) process affirmatively created an impression that Beckman was conforming

25 its activities to comply with the 510(k) process and thereby conforming to

26 legitimate and sustainable business activities, a state of affairs that differed in a

27 material way from that which actually existed.

28

12. **The March 22, 2010 Form 8-K and March 23, 2010 Barclays Capital Global Healthcare Conference**

144. In its March 22, 2010 Form 8-K, Beckman stated, in part:

> As previously disclosed, on February 5, 2010, Beckman Coulter, Inc. sent a notice to customers who use our AccuTnI troponin test kits on our UniCel DxI immunoassay system. The notice alerted these DxI customers to a positive bias in troponin results obtained on our DxI system when compared with troponin results obtained on our Access system using the same test kits. The notice recommended that customers using troponin test kits on DxI systems take certain actions, among them discontinuing use of troponin test kits on DxI if an alternative methodology was available. Our February 5, 2010 letter also noted that we were continuing to work with the U.S. Food and Drug Administration ("FDA") to resolve the issues.
>
> *FDA has indicated to us that it believes that certain modifications to our troponin test kits as used on DxI systems and as used on Access systems were made without obtaining appropriate product clearances from FDA.* Based upon our discussions with FDA we believe that *we will be required to impose further restrictions or conditions on the use of troponin test kits on DxI systems in the U.S., and those conditions will likely include transitioning U.S. DxI customers to some other form of troponin testing until we can obtain 510k clearance from FDA for troponin testing on DxI.* Based