upon our discussions with FDA, we also believe that it is likely that we will be able to continue to provide troponin test kits with appropriate additional notices and precautions to U.S. customers who currently use Access systems for troponin testing. We are continuing to work to resolve these matters with FDA and expect to update customers when resolution is reached. We expect to seek 510k clearance for our troponin test kits for both the DxI and Access systems. We cannot be certain of when we will resolve these matters with FDA.

In 2009 we recognized U.S. revenues of approximately $60 million for troponin testing. We estimate that 25 to 50% of this revenue was derived from test kits run on our DxI systems. While we are not yet able to quantify the impact on our operating results of any new restrictions on the sale of our troponin test kits, *these matters may have a material adverse impact on our previously issued outlook for the full year 2010*. We intend to update our outlook upon the release of our first quarter results in April 2010.

The company is committed to ensuring patient safety and regulatory compliance. *Given the issues pertaining to our troponin test kits as well as our recent recall relating to sodium testing on our DxC chemistry systems, we are currently evaluating our internal processes and procedures regarding our product, quality and regulatory systems. It is possible that more of our products could be affected and the actions with*

1    *respect to those products could adversely affect our*
2    *operating results.* (Emphasis added.)

3        145.   On March 23, 2010, Beckman participated in a Barclays Capital
4    Global Healthcare Conference with analysts, media representatives and investors,
5    during which Defendant Slacik represented the following:

6        [SLACIK:] And I don't have much I can say to
7        expand upon the 8-K today because it is such recent
8        news, but I would point out that the ongoing – the
9        discussions with the FDA are ongoing and so resolution
10       of this use of troponin is something that will play out
11       over the next few weeks. Our expectation is to continue
12       to update as appropriate. But we don't think that we can
13       give the full financial impact of this until we do resolve
14       the issues with the FDA, decide on next steps and
15       proceed.

16       So right now our expectation is at the end of the
17       first quarter when we report results on April 28, that will
18       be our next opportunity to update you on our outlook for
19       the year which would take into account not only first-
20       quarter results, what our expectations would be for the
21       impact of this troponin work with the FDA, as well as
22       other variables during the year which we would take into
23       account, for example the weak euro which seems to
24       persist.

25                    *        *        *

26       [ANALYST:] I may kick it off here and ask, given
27       that, as you disclosed in the 8-K, which is I'm sure
28       [what] everybody's wondering about right now, the

1    troponin itself is about $30 million or less than 1% of
2    revenue. Could you talk about the potential impact in
3    terms of your ability to continue gaining share in
4    immunoassay?

5    [SLACIK:] Sure. As we said in the 8-K last night,
6    we do about $60 million of total business on troponin in
7    the United States. And of that $60 million, approximately
8    $30 million of that is run on our Access 2 instruments,
9    which, under our current discussions with the FDA, looks
10   like we will be able to continue to do. The remaining $30
11   million is run on our DxI large platform business and of
12   that part of the market, many of our customers also have
13   DxI instruments on which they run troponin. And so
14   many of them should be able to revert to their Access
15   instruments.

16   But based on our current discussions with the FDA
17   and as I mentioned, they are not finalized, but under both
18   circumstances, it looks like we are going to be severely
19   constrained and possibly have to temporarily stop selling
20   troponin on the DxI and possibly also have to temporarily
21   stop promoting and marketing the troponin to the Access
22   2 users as well.

23   And so the impact to that, to answer Evan's
24   question, is that for a period of time between now and
25   when we can refile the 510(k) applications for the
26   troponin tests, we may be constrained in terms of our
27   ability to add new customers to our cardiac panel, which,
28   of course, the troponin is a key marker in that panel.

And so obviously our key focus for the Company is to, going forward, to, first of all, quickly resolve the situation with the FDA, reach agreement on next steps and what data they want filed in their 510(k)s. Second, to collect that data, get it filed and get this resolved, get the 510(k)s wrapped up and basically regain the ability to market troponin on both the Access, as well as the DxI instruments as soon as possible. But for this interim period, it looks like we will probably be somewhat constrained in our ability to market troponin to new customers.

146. The above-referenced statements from Beckman's March 22, 2010 Form 8-K and March 23, 2010 Barclays Capital Global Healthcare Conference were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a) Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b) The AccuTnI test kit's positive bias on DxI Systems disrupted the work flow of Beckman's customers more than a bias would with any other immunoassay reagent test, materially adversely impacting Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(c) The adverse actions by the FDA with respect to the significant changes Beckman made to its AccuTnI test kit without marketing approval or clearance from the FDA disrupted the work flow of Beckman's customers more

than marketing any other immunoassay reagent test without marketing approval or clearance would, materially adversely impacting Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(d)     in light of (a)-(c), above, past revenues, earnings, sales, or growth with respect to Beckman's AccuTnI test kit were misleading measures by which to assess the impact of adverse FDA action on Beckman's operations, products, and prospects, and;

(e)     in light of (a)-(c), above, statements concerning the Company's evaluation of its of its internal process and procedures affirmatively created an impression that Beckman was conforming its activities to comply with the 510(k) process and thereby was conforming to legitimate and sustainable business activities, a state of affairs that differed in a material way from that which actually existed.

**13.     The April 12, 2010 Form 8-K**

147.   On April 12, 2010, in its Form 8-K, Beckman stated the following:

> As previously disclosed, FDA has indicated to us that it believes certain modifications to our troponin test kits, as used on our DxI systems as well as used on our Access systems, were made without obtaining appropriate product clearances from the agency. We are in discussions with FDA regarding the 510(k) clearance process for our troponin test kits for both the DxI and Access immunoassay systems. ***However, we can not provide any assurances on when we will be able to return troponin to the DxI.***

1
2
3
4
5
6
7
8
9
10
11
12
13
14

We also previously disclosed that, based upon our discussions with FDA, we believe it is likely we will be able to continue to provide troponin test kits with appropriate additional notices and precautions to U.S. customers who currently use Access systems for troponin testing. ***However, we can provide no assurances that FDA will continue to permit us to do so.*** Moreover, for U.S. labs that are not currently using Access systems to perform troponin testing, it is unlikely that we will be able to provide troponin test kits for use on Access analyzers until we obtain 510(k) clearance. ***We are continuing to work to resolve these matters with FDA but can provide no assurances regarding when 510(k) clearance will be obtained.***(Emphasis added.)

15   148.   The above-referenced statements from Beckman's April 12, 2010
16   Form 8-K were materially false and misleading and omitted to state material facts
17   necessary to make the statements contained therein not misleading at all times
18   throughout the Class Period because:

19          (a)   Beckman had long-standing, undisclosed, quality, safety, and
20   compliance problems, which were exacerbated by several rounds of layoffs (*see*
21   ¶¶5, 53-69, 79);

22          (b)   The AccuTnI test kit's positive bias on DxI Systems disrupted
23   the work flow of Beckman's customers more than a bias with any other
24   immunoassay reagent test would, materially adversely impacting Beckman's
25   recurring revenue stream, particularly the recurring revenues generated by
26   Beckman's larger customers who utilized the DxI Systems and/or Beckman's
27   automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101); and

28

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 8:10-CV-1327-JST (RNBx)                                                77

(c)     The adverse actions by the FDA with respect to the significant changes Beckman made to its AccuTnI test kit without marketing approval or clearance from the FDA disrupted the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, materially adversely impacting Beckman's recurring revenue stream, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101).

### 14.     The April 28, 2010 Form 8-K, Press Release and Earnings Call

149.   In a press release issued and attached to a Form 8-K filed with the SEC on April 28, 2010, Beckman stated, in part:

> **Product Compliance and Quality Matters**
>
> Scott Garrett, Chairman, President and Chief Executive Officer, said, "We have committed considerable resources to characterize the factors underlying the product compliance and quality issues, restore troponin to an unambiguous cleared status and ensure that we are on a strong foundation for regulatory compliance in the future.
>
> "As reported through our SEC filings, we have recalled the troponin test, a critical care test used to aid in the diagnosis of cardiac events, from one of our automated immunoassay systems, the DxI, and advised our DxI customers to find an alternate method for troponin testing. In the U.S., we recognized approximately $60 million in total annual revenue from troponin in 2009. Of this total, we estimate that $10 to $15 million is at risk.

"Here's what we know to date:

- FDA has classified our troponin recall as a Class II event and has agreed to give customers an extension to August 1, 2010 to switch from running troponin on DxI immunoassay systems to an alternate method.

- We continue to work with FDA to establish a pathway to an unambiguous cleared status in the U.S. We have submitted our clinical study proposal to FDA to clear troponin for use on all of our automated immunoassay systems and anticipate a written response soon. Until we have reached agreement with FDA there can be no assurance as to the scope of the clinical study that will be required to clear the test.

- Based on a review of 58 of our immunoassay tests and our customer complaint files, we don't believe there are any other significant cross platform bias issues with these immunoassay tests and certainly none that might approach the magnitude of troponin.

- As a result of our compliance and quality improvement initiative, we are undertaking improvements to other products, including our sensor based tests used for glucose and sodium testing on our LX and DxC chemistry systems.

- As we indicated in our March 22, 2010 SEC filing, we are evaluating our internal processes and

procedures regarding product compliance and quality systems. It is possible that other products could be impacted resulting in corrective actions that might adversely affect our operating results.

"Because we value customer feedback, we have engaged customers in a series of regional forums and established a customer advisory group to provide additional insight into both product performance and customer communications."

                    *        *        *

**Full Year 2010 Outlook**

"We are updating our full-year outlook based on the present status of pending product compliance and quality matters and taking into account current foreign exchange rates. We will update our 2010 outlook, as needed, as we work to resolve product compliance and quality matters. (Emphasis added.)

150. After issuing its first quarter 2010 financial results, Beckman hosted a conference call for analysts, media representatives and investors on April 28, 2010, during which defendant Garrett represented the following:

[GARRETT:] Before I move on with financial results for the quarter, I will comment on the Company's current product issues. Let me assure you, we remain committed and are heavily *focused on quality and compliance for the balance of 2010 and beyond. Quality is the single most important function of every employee at Beckman Coulter.* We understand and regret that issues associated with our products have disrupted some

customer operations and caused them considerable frustration. Beckman Coulter built its reputation on quality and customer satisfaction. Let me emphasize to customers who might be listening today, that we are committed to your satisfaction and working in close collaboration with you to address any and all issues that affect your operations.

We have committed considerable resources to characterize the factors underlying current product compliance and quality issues, restore troponin to an unambiguous cleared status, and ensure that we reinforce a solid foundation for regulatory compliance in the future. As reported through our SEC filings we have recalled the troponin test, a critical care test used to aid in the diagnosis of cardiac events from one of our automated immunoassay systems, the DxI, and advised our DxI customers to find an alternate method for troponin testing. In the U.S. we recognize approximately $60 million in annual revenue from troponin in 2009. Of this total, we estimate that 10 to $15 million is currently derived from troponin tests run by customers with DxI systems only.

Here is what we know to date. FDA has classified our troponin recall as a Class II event and has agreed to give customers an extension to August 1, 2010, to switch from running troponin on DxI immunoassay systems to an alternate method. We continue to work with FDA to

establish a pathway to an unambiguous cleared status in the U.S. We submitted our clinical study proposal to FDA to clear troponin for use all of our automated immunoassay systems and anticipate their response soon. Until we have reached agreement with FDA, there can be no assurance as to the scope of the clinical study that will be required to clear the test.

Based on a review of 58 of our immunoassay tests and other customer complaint files, we don't believe there are any other significant cross platform bias issues with these immunoassay tests, and certainly none that might approach the magnitude of troponin. As a result of our compliance and quality improvement initiative, we're undertaking improvements to other products including our sensor based tests used for glucose and sodium testing on our L X and DXE chemistry systems. As we indicated in our March 22, 2010, SEC filing, we're evaluating our internal processes and procedures regarding product compliance and quality systems. It is possible that other products could be impacted resulting in corrective actions that might adversely affect our operating results. Because we value customer feedback, we have engaged customers in a series of regional forums and established a customer advisory group to provide additional insight into both product performance and customer communications.

*       *       *

1    [ANALYST:] Scott, with respect to the troponin
2    and customers and retention, you kind of made a
3    comment at the end that they're largely standing by you.
4    What's the feedback that you heard and do you anticipate
5    retention rates will be where they normally are
6    historical[ly] [sic] or are these disruptions causing any
7    second thoughts, and then kind of an adjunct to that
8    question, what are your expectations for the guidance of
9    the year for DxI placements in the U.S.?

10    [GARRETT:] Well, we're not going to be specific
11    about DxI placements, Quintin. We believe that our
12    customers are largely quite loyal to us. We expect to
13    continue to have excellent retention rates, and we're
14    working very hard right now throughout our whole
15    commercial organization to make sure our customers
16    understand that we're taking this very seriously and
17    working with them to make whatever transitions they
18    make as smooth as possible, and so that we can bring
19    them back to the DxI as quickly as possible. (Emphasis
20    added.)

21    151.   The above-referenced statements from Beckman's April 28, 2010
22    Form 8-K, Press Release and Earnings Call were materially false and misleading
23    and omitted to state material facts necessary to make the statements contained
24    therein not misleading at all times throughout the Class Period because:

25         (a)    Beckman had long-standing, undisclosed, quality, safety, and
26    compliance problems, which were exacerbated by several rounds of layoffs (*see*
27    ¶¶5, 53-69, 79);

28

1       (b) The AccuTnI test kit's positive bias on DxI Systems disrupted

2    the work flow of Beckman's customers more than a bias with any other

3    immunoassay reagent test would, materially adversely impacting Beckman's

4    recurring revenue stream to a greater extent than disclosed by Defendants,

5    particularly the recurring revenues generated by Beckman's larger customers who

6    utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46,

7    77-80, 89, 97, 101);

8       (c) The adverse actions by the FDA with respect to the significant

9    changes Beckman made to its AccuTnI test kit without marketing approval or

10   clearance from the FDA disrupted the work flow of Beckman's customers more

11   than marketing any other immunoassay reagent test without marketing approval or

12   clearance would, materially adversely impacting Beckman's recurring revenue

13   stream  to a greater extent than disclosed by Defendants, particularly the recurring

14   revenues generated by Beckman's larger customers who utilized the DxI Systems

15   and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

16      (d) in light of (a)-(c), above, past revenues, earnings, sales, or

17   growth with respect to Beckman's AccuTnI test kit were misleading measures by

18   which to assess the impact of adverse FDA action on Beckman's operations,

19   products, and prospects, and;

20      (e) in light of (a)-(c), above, statements concerning the Company's

21   review of 58 other immunoassay tests, review of customer complaint files,

22   evaluation of its internal process and procedures, product improvements per its

23   compliance and quality improvement initiative, and engaging with customers

24   affirmatively created an impression that Beckman was proactively seeking to

25   address a limited number of discrete quality, safety, and compliance issues when in

26   fact the scope and scale of Beckman's internal evaluation and its quality, safety,

27   and compliance problems were greater and materially more significant than what

28   was then being disclosed.

### 15.   The May 5, 2010 Form 10-Q

152.   In its Form 10-Q filed May 5, 2010, Beckman echoed some of the statements contained in the press release issued April 28, 2010. In addition, Beckman affirmed its commitment to quality and compliance, stating that "Quality is the single most important function of every employee at Beckman Coulter and we are determined to restore confidence in Beckman Coulter." The 10-Q further provided the following:

> Our core strategy is to simplify, automate and innovate complex biomedical testing processes. **Our strategic initiatives for 2010 continue our focus on growth, quality and operating excellence**:

> We are committed to ensuring patient safety and regulatory compliance. As discussed in more detail below under "Product Compliance and Quality Matters", the U.S. Food and Drug Administration ("FDA") has indicated to us that it believes that certain modifications to our troponin test kits as used on DxI immunoassay systems and as used on Access immunoassay systems were made without obtaining appropriate product clearances from FDA. Given the issues pertaining to our troponin test kits as well as our recent recall relating to sodium testing on our DxC chemistry systems and other quality and compliance matters, we are currently evaluating our internal processes and procedures regarding our product, quality and regulatory systems. We remain committed and are heavily focused on quality and compliance for the balance of 2010 and beyond. Quality is the single most important function of every

employee at Beckman Coulter and we are determined to restore confidence in Beckman Coulter.

\*        \*        \*

**Product Compliance and Quality Matters**

\*        \*        \*

- Based on a review of 58 of our immunoassay tests and our customer complaint files, we don't believe there are any other significant cross platform bias issues with these immunoassay tests and further believe we have no others that might approach the magnitude of troponin.

- As a result of our compliance and quality improvement initiative, we are undertaking improvements to other products, including our sensor based tests used for glucose and sodium testing on our LX and DxC chemistry systems.

- As we indicated in our March 22, 2010 SEC filing, we are evaluating our internal processes and procedures regarding product compliance and quality systems. It is possible that other products could be impacted resulting in corrective actions that might adversely affect our operating results.

\*        \*        \*

. . . The process for new 510(k) clearances for our products could be lengthy and costly and may require the withdrawal of product from the market until such clearances are obtained as well as the imposition of recalls or the initiation of enforcement actions against us by FDA, including warning letters, fines, seizures, consent orders or injunctions.  The loss of revenue from our products that are the subject of FDA inquiries could be more than we estimate and our foreign sales could

also be adversely affected. These issues could cause us to lose customers and there could be unanticipated costs associated with these matters or other discussions with FDA.

Given the issues pertaining to our troponin test kits as well as our recent recall relating to sodium testing on our DxC chemistry systems, we are currently evaluating our internal processes and procedures regarding our product, quality and regulatory systems. It is possible that more of our products could be affected and the actions with respect to those products could adversely affect our business and operating results. Our internal review of our products could reveal failures in our processes and systems which could be significant. (Emphasis added.)

153. The above-referenced statements from Beckman's May 5, 2010 Form 10-Q were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)    Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)    The AccuTnI test kit's positive bias on DxI Systems disrupted the work flow of Beckman's customers more than a bias with any other immunoassay reagent test would, materially adversely impacting Beckman's recurring revenue stream to a greater extent than disclosed by Defendants, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(c)     The adverse actions by the FDA with respect to the significant changes Beckman made to its AccuTnI test kit without marketing approval or clearance from the FDA disrupted the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, materially adversely impacting Beckman's recurring revenue stream  to a greater extent than disclosed by Defendants, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101);

(d)     in light of (a)-(c), above, statements concerning the Company's review of other immunoassay tests, review of customer complaint files, evaluation of its internal process and procedures, and product improvements per its compliance and quality improvement initiative, affirmatively created an impression that Beckman was proactively seeking to address a limited number of discrete quality, safety, and compliance issues when in fact the scope and scale of its efforts and its problems were materially more significant than what was then being disclosed, and;

(e)     in light of (a)-(c), above, statements concerning possible future events regarding time, costs and risks associated with 510(k) processes, lost customers, lost revenues, and unanticipated costs, failed to inform investors of the material adverse information Beckman had already concealed, misstated and omitted.

**16.     The May 19, 2010 Robert W Baird Stock Conference**

154.   On May 19, 2010, at a Robert W. Baird Growth Stock Conference Paul Glyer, Beckman's Senior Vice President of Strategy and Business Developments, represented the following:

> [GLYER:] All right, let me give you a quick
> update on troponin and some of the challenges that we
> have had with this particular test. . . .

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 8:10-CV-1327-JST (RNBX)                                      88

It is a very, very important test. There are two issues with respect to troponin that we have had with our tests. One is a bias issue and that is that the troponin tests on our DxI immunoassay instruments has a positive bias result relative to our Access instrument, which is a lower volume system. And our U.S. customers have been instructed to transition their testing from the DxI instruments to an alternate method by August 1.

The second issue we have is that the FDA has indicated to us that they believe that we've made certain changes to the test without getting appropriate clearances. And so as far as they are concerned, we have an unclear device in the form of the troponin test on the marketplace.

So what does that mean for customers? We believe that we will be able to continue to provide our customers with the troponin test for our Access instruments, perhaps with appropriate additional notices and precautions. This is what we have been advised to this point by the FDA. We have yet to hear from the FDA formally and so we don't have a firm position on that. However, about 10% of our U.S. troponin accounts are run on only DxI instruments and for those accounts, those customers will have to transition to an alternate method.

\*       \*       \*

[ANALYST:] On the quarterly conference call, you talked a little bit – I know Scott talks about some of the things that you are going to do for your DxI-only

customers that will eventually no longer be able to run troponin in terms of maybe reimbursing if they have to do send-outs. Can you give us an update on kind of how the customer response has been so far and what should we expect here over the back half of the year as the DxI customers have to find alternative methods?

[GLYER:] Well in our revised outlook that we gave on April 28, I indicated that $0.15 to $0.25 per share was being set aside to beef up the investment in quality and regulatory organizations to cover the cost of a complete evaluation of our quality management systems to provide funds to help transition customers in a very thoughtful way to an alternate method, funds to help fund the clinical trials work that we have to accomplish and all of that.

I think the more important question perhaps, Quintin, that you are intending to ask is what has been the customer response to that? Obviously any time that you interrupt a customer's workflow, that is at a minimum annoying. We have mightily annoyed our customers and for that we are deeply apologetic.

This is not certainly our desire for our customers. We have in fact been so successful at embedding ourselves in their workflow that when we don't perform for them, it does create significant issues for them. And so the real question is what has been their response to that? And obviously they are upset. They are concerned. They want to know what we are doing about it and we've

been giving them regular updates. So far although it seems like a long time, it's only been a couple of months since these events have arisen. And so far we have not had enough data points to really assess whether or not customers are intending to transition their testing to other suppliers and other areas.

But what we can observe to this point is that our customers are largely sticking with it. If you think about it in these terms, our industry has seen a lot of consolidation over the years. And as a result of that, the number of choices customers have had have [sic] been going down. And so our customers actually and the entire industry really want us to succeed here. They really want us to work these issues out and remain in the marketplace. It's not as if our customers are rooting for us to fail.

And as a result of that, I think largely our customers want to stick with us to see us through this. They just want some reassurance that we will certainly be back on the market at some point in time, and so we are as inclined to share with them as much or more than we are actually able to communicate with investors as we make progress here.

So so far, I'd say the customers have been quite concerned. They've been very vocal. We've actually been doing a lot of listening and a lot of learning on our part, but we've made some, I think, some good progress in building bridges of understanding with our customers.

155.    The above-referenced statements from Beckman's May 19, 2010 Robert W Baird Stock Conference were materially false and misleading and omitted to state material facts necessary to make the statements contained therein not misleading at all times throughout the Class Period because:

(a)    Beckman had long-standing, undisclosed, quality, safety, and compliance problems, which were exacerbated by several rounds of layoffs (*see* ¶¶5, 53-69, 79);

(b)    The AccuTnI test kit's positive bias on DxI Systems disrupted the work flow of Beckman's customers more than a bias with any other immunoassay reagent test would, materially adversely impacting Beckman's recurring revenue stream to a greater extent than disclosed by Defendants, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101), and;

(c)    The adverse actions by the FDA with respect to the significant changes Beckman made to its AccuTnI test kit without marketing approval or clearance from the FDA disrupted the work flow of Beckman's customers more than marketing any other immunoassay reagent test without marketing approval or clearance would, materially adversely impacting Beckman's recurring revenue stream to a greater extent than disclosed by Defendants, particularly the recurring revenues generated by Beckman's larger customers who utilized the DxI Systems and/or Beckman's automation instruments (*see* ¶¶37-46, 77-80, 89, 97, 101).

## POST-CLASS PERIOD EVENTS

156.    Shortly after the end of the Class Period, on July 27, 2010, Beckman participated at the 2010 AACC Analyst event. Garrett spoke about the progress of Beckman's internal review of quality processes and procedures and the remediation plans that were being implemented and warned investors that, as part

1   of the internal review, Beckman was likely to uncover more quality problems with
2   additional products:

3       We will see more issues arise as we improve our
4       compliance and quality. We expect more product
5       corrective announcements from the industry in general
6       going forward. As each company applies more internal
7       scrutiny, here's more customer feedback and under a
8       heightened regulatory activity.

9             *     *     *

10      So as we move to a very, very high state of compliance,
11      we will undoubtedly find some other issues. We're
12      striving for zero. And we will get there. Zero customer
13      notifications per year. But in the short term, to reach that
14      goal, we're certainly going to be uncovering a few
15      additional issues. However, I'm confident that additional
16      issues will not be as severe an impact on our customers
17      as those we've recently seen from Troponin.

18      157.   Notwithstanding these warnings about probable additional quality
19  issues, the Company was well aware already that they had discovered and would
20  continue to discover many quality and compliance problems as they continued to
21  implement the remediation program.

22      158.   On August 5, 2010, Beckman filed with the SEC its Form 10-Q for
23  the second quarter of 2010. Therein, Beckman echoed what was said in the July 22,
24  2010 press release regarding its compliance and quality matters.   In addition,
25  Beckman stated:

26      The process for new 510(k) clearances for our products
27      could be lengthy and costly and may require the
28      withdrawal of product from the market until such

clearances are obtained as well as the imposition of recalls or the initiation of enforcement actions against us by FDA, including warning letters, fines, seizures, consent orders or injunctions. The loss of revenue from our products that are the subject of FDA inquiries could be more than we estimate and our foreign sales could also be adversely affected. These issues could cause us to lose customers and there could be unanticipated costs associated with these matters or other discussions with FDA.

Given the issues pertaining to our troponin test kits as well as our recent recalls relating to sodium testing on our DxC chemistry systems, we are currently evaluating our internal processes and procedures regarding our product, quality and regulatory systems. It is possible that more of our products could be affected and the actions with respect to those products could adversely affect our business and operating results. ***Our internal review of our products could reveal failures in our processes and systems which could be significant.*** (Emphasis added.)

159. On September 6, 2010 Garrett resigned his positions as Chairman of the Board, Chief Executive Officer, President and Director of Beckman.

160. Analysts' reaction to the resignation was mixed. Bruce Cranna of Jefferies & Company, commented in a report dated September 7, 2010. that "[w]hile likely a longer term positive, we believe Garrett's resignation speaks to continued instability in BEC's IA franchise." Cranna also commented that the abruptness of the resignation suggested that the issues that Beckman faced were not improving. Other analysts were more surprised by the timing than the actual

1   resignation.  In a Morgan Stanley report dated September 7, 2010, David R. Lewis

2   stated that while not surprised by the resignation, it was the timing of the

3   resignation was a question "given on-going regulatory and quality remediation

4   efforts." In an October 11, 2010 report from William Blair & Company initiating

5   coverage, Brian Weinstein also expressed surprise at the timing of the resignation

6   and commented on the fact that Garrett had spent a significant amount of time

7   meeting with customers to try and smooth concerns over the Company's troponin

8   problems and wondered whether this move would undo all of the goodwill

9   garnered from those meetings.

10                              **CLASS ACTION ALLEGATIONS**

11          161.  Plaintiff brings this action as a class action pursuant to Rule 23 of the

12   Federal Rules of Civil Procedure on behalf of all persons who purchased or

13   otherwise acquired Beckman securities during the Class Period (the "Class").

14   Excluded from the Class are Defendants and their families, the officers and

15   directors of the Company, at all relevant times, members of their immediate

16   families and their legal representatives, heirs, successors or assigns and any entity

17   in which Defendants have or had a controlling interest.

18          162.  The members of the Class are so numerous that joinder of all

19   members is impracticable. The disposition of their claims in a class action will

20   provide substantial benefits to the parties and the Court. Beckman has over 69

21   million shares of stock outstanding, owned by hundreds if not thousands of

22   persons.

23          163.  There is a well-defined community of interest in the questions of law

24   and fact involved in this case. Questions of law and fact common to the members

25   of the Class, which predominate over questions which may affect individual Class

26   members, include:

27                      (a)     Whether the 1934 Act was violated by Defendants;

28

1    (b)    Whether Defendants omitted and/or misrepresented material
2  facts;

3    (c)    Whether Defendants' statements omitted material facts
4  necessary to make the statements made, in light of the circumstances under which
5  they were made, not misleading;

6    (d)    Whether Defendants knew or with deliberate recklessness
7  disregarded that their statements were false and misleading;

8    (e)    Whether the price of Beckman securities was artificially
9  inflated; and

10    (f)    The extent of damage sustained by Class members and the
11  appropriate measure of damages.

12    164.  Plaintiff's claims are typical of those of the Class because Plaintiff
13  and the Class sustained damages from Defendants' wrongful conduct.

14    165.  Plaintiff will adequately protect the interests of the Class and has
15  retained counsel who are experienced in class action securities litigation. Plaintiff
16  has no interests which conflict with those of the Class.

17    166.  A class action is superior to other available methods for the fair and
18  efficient adjudication of this controversy.

19  **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
20  **FRAUD ON THE MARKET DOCTRINE**

21    167.  At all relevant times, the market for Beckman securities was an
22  efficient market for the following reasons, among others:

23    (a)    Beckman's stock met the requirements for listing, and was
24  listed and actively traded on the NYSE, a highly efficient and automated market;

25    (b)    As a regulated issuer, Beckman filed periodic and other public
26  reports with the SEC and the NYSE;

27    (c)    Beckman regularly communicated with public investors by
28  means of established market communication mechanisms, including through

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 8:10-CV-1327-JST (RNBx)                                           96